## C. H. WATSON v. STATE.

No. A-643.   Opinion Filed July 22, 1912.

(124 Pac. 1101.)

1.   **TRIAL**—Conduct of Counsel—Action of Court.   (a) When the record discloses that counsel for the state, in the prosecution of a person charged with crime, has been guilty of conduct calculated to arouse the prejudice or passion of the jury and prevent the accused from having a fair and impartial trial, a conviction had should be set aside by the trial court, and a new trial awarded.

(b)   When the record on appeal discloses the fact that counsel for the prosecution in a murder trial has been guilty of misconduct in attempting to get before the jury incompetent evidence calculated and intended to prejudice the rights of the person on trial, this court cannot uphold a judgment of conviction, and a new trial will be awarded.

(c)   Mild rebukes of counsel guilty of prejudicial conduct, and continual efforts to override the rulings of the court and the plain principles of law in endeavoring to get incompetent and prejudicial matters before the jury, cannot be held to cure the injury resulting from such prejudicial action.

(d)   In many cases rebukes do not seem to have any effect upon prosecuting officers, and, the effect of such misconduct being reasonably calculated to prejudice the jury, the only way to secure a fair trial when such conduct occurs is to set aside a verdict so obtained.

(e)   The repeated asking of incompetent questions, which clearly have for their purpose the intimation of something to the jury that is either not true or not capable of being proven if true, is wrong, and such conduct of counsel is not cured because the court sustains objections to the questions.

(f)   In jury trials, incalculable harm is often done by counsel in asking incompetent questions in the hearing of the jury and thereby forcing the adverse party to object to them also in the hearing of the jury, which manifests a fear of the incompetent questions, and gives emphasis to the harmful matter they are supposed to contain.

2.   **SAME.**   (a) The county attorney is a quasi judicial officer, and represents the state in all criminal prosecutions.   The state at the hands of the law demands no victims; it seeks justice only. And it is as much the duty of the prosecuting attorney to see that no innocent man suffers as it is to see that no guilty person escapes.   He should act impartially, and should present the state's case fairly and vigorously, but should not press upon the jury any deductions from the evidence that are not reasonably legitimate.   When, in his zeal, he permits himself to appeal to the

prejudice or passion of the jury, he is no longer an impartial officer, but is a heated partisan.

(b) When special counsel assist a prosecuting attorney in the trial of a criminal case, such counsel represents the county attorney and is governed by the same rules of propriety.

(c) However strong the prosecuting attorney's belief in the prisoner's guilt may be, he must remember that, though unfair trials may happen to result in doing justice in particular cases, yet justice so obtained is dangerous to the whole community. It matters not how guilty a person on trial charged with crime may be, he is entitled to a fair and impartial trial, and a judgment of conviction for murder, and the imposition of a life sentence, would be as great a wrong to society if unfairly secured, although the accused might be guilty, as it would for such person to go unwhipped of justice.

3.   APPEAL—Prejudicial Nature of Error. Trial courts and prosecuting attorneys in this state must conduct the trial of criminal cases in a fair and impartial manner and according to the rules of law. In the interest of the law-abiding public, this court has used every reasonable means to uphold judgments of conviction when in good conscience it could do so. But the aversion of this court to reversing judgments of conviction must not be understood by the trial courts and prosecuting attorneys as a license to disregard the rights of persons on trial accused of crime. It is no compliment to a trial court or prosecuting attorney to have the doctrine of harmless error invoked by this court in order to prevent a miscarriage of justice, and excuse some error growing out of their misconduct or failure to follow the law.

(Syllabus by the Court.)

*Appeal from District Court, Bryan County;*
*M. C. Garber, Judge.*

C. H. Watson was convicted of murder, and appeals. Reversed, with directions to grant new trial.

*Chas. E. McPherren* and *Utterback, Hayes & McDonald,* for plaintiff in error.

*J. T. McIntosh,* Co. Atty., and *C. B. Cochran,* Deputy Co. Atty., for the State.

ARMSTRONG, J. The plaintiff in error, C. H. Watson, was convicted at the July, 1909, term of the district court of Bryan county for the murder of Wesley Crabtree, and his punishment fixed at imprisonment for life in the state penitentiary. The appeal was perfected in this court on the 7th day of March, 1910.

In 1907 the deceased, Crabtree, married Miss Ollie Watson, a minor daughter of the accused. The marriage was against the wishes of the accused and engendered a bitter feeling between them, out of which threats were indulged in on the part of both the accused and deceased. In the spring of 1908, the accused concluded to become reconciled to the marriage and sent Sheriff Hamilton to see the deceased and effect the reconciliation, which was done, and the families exchanged visits. Later friction arose between the accused and the deceased and his wife over the shooting of a mule. About a month before the killing occurred, the deceased was in a hardware store in the town of Sterret and purchased some cartridges in company with his brother-in-law, who said that one of the cartridges then being purchased would get the accused Watson. On Tuesday night before the homicide, the wife of the deceased spent the night at the home of the accused, and while there charged that her sister Addie had been forced to marry Dr. McCalib on account of misconduct the accused had seen between her sister and Dr. McCalib, and said that the information had been given the deceased by Coleman Hodge, Curt Chestnut, and a man named Thomas. This statement by the wife of the deceased was communicated to the accused by his daughter Addie, who was very much affected by it. The accused attempted to pacify her, and thereafter investigated the report, and learned that no such statement had in fact been made to the deceased. The wife of the deceased, learning of the investigation, returned to the home of the accused just prior to the homicide and denied making some parts of the statement, and told her father, the accused, that deceased, her husband, had not been in the habit of carrying a gun for him, but that he would do so hereafter. On the day following such conversation, the accused went to Durant, and while there was passed by the deceased and a man who was a stranger to the accused. Neither spoke, but, after passing where the accused sat, the deceased motioned back and said, "There is the old son of a bitch now." On the following day, which was Saturday, the accused returned to Durant and passed the deceased on the road home, and was

asked by him about lies which he said the accused was trying to make out against him. The accused asked what lies he meant, and he replied, "The Coleman Hodge lies," and added that he would shoot the accused's damn head off if he attempted to make him out a liar, and exhibited a pistol at the time.

The testimony on behalf of the accused tends to show that on the Monday following he went to the town of Allison on business connected with the election, and arrived there about 1 o'clock. After transacting his business, he started home, and met one McCalib, and was talking to him when the deceased and his brother-in-law rode up. Neither spoke. The accused and McCalib started to the home of McCalib, when the deceased called to the accused and said, "Watson, I want to talk to you." The accused replied, "I have no talk for you," and did not stop, but turned his head and looked toward the deceased, who stated that he had come to settle "those damn lies" the accused had been telling. The accused replied by inviting him to go to Coleman Hodge and not to be jumping on him, that he had a statement from Hodge, and that deceased could go to Hodge and settle the affair. The deceased then said, "Damn you and Hodge. If you and Hodge say that you are both damn liars." The accused then started toward Chestnut's store, which was near, and the deceased started toward the same place. The accused told the deceased that he had a letter from Hodge, and that he could read it; that the accused had no settlement whatever to make with the deceased. During this conversation both parties were going toward Chestnut's store from slightly different directions, and, when they approached the corner of the porch in front of the store, the deceased said, "You and Coleman Hodge have been talking about me." The accused replied, "You are a damn liar." When he made this remark the deceased attempted to draw a weapon, and the accused quickly drew a revolver and fired. Accused testified that he thought it necessary to do so in order to save his life; that, at the time he shot, the deceased was making a demonstration to draw a weapon.

The testimony of the state tended to show that: On the Sunday before the homicide accused stated to a witness that de-

ceased was a bad boy and that he was going to kill him, and that he would do it before the sun went down Saturday night. On the day of the homicide the deceased had been to the little town of Allison to get medicine for a sick horse, and while there passed the accused and McCalib, and spoke to them. The deceased then called the accused and said, "Mr. Watson, I want to talk to you a while." The accused replied, "I have no talk for you." The deceased then said, "I want to see you about them lies or talk that Coleman Hodge has been telling you." The accused said, "Go to Coleman Hodge about it," to which the deceased replied, "I have been to see him and I can't find him." The accused at that time was going in an opposite direction from the deceased. Deceased then said that he did not want to be made out a liar. When this statement was made, the accused whirled around and started in the direction of the deceased, saying, "I don't take the lie off no man," and, when he got within six feet of the deceased, deceased said, "Mr. Watson, you have been talking about me," to which Watson replied, "You are a God damn liar," and the deceased replied, "You are a damn liar." The accused then drew a pistol and shot the deceased down while he was standing with his left hand on a box and the right hand by his side, "doing nothing except trying to talk the matter over."

The witnesses to the homicide were friends of the deceased and hostile to the accused.

The most serious error disclosed by the record of the proceedings in this case is the conduct of counsel on behalf of the state. The accused contends that the special prosecutor, Hon. J. M. Crook, and the county attorney, and his assistant, systematically endeavored to and did prevent the accused from having a fair and impartial trial. The prejudicial conduct, it is contended, grew out of an effort on the part of the state's counsel to get matters before the jury by asking incompetent questions on matters well known to be inadmissible, and by improper argument, as well as securing the introduction of testimony over the

objection of the accused, which counsel for the accused contend was incompetent and prejudicial.

The special prosecutor in this case was a former district attorney of Texas, and a man of considerable experience in the practice of criminal law. When the accused was on the stand in his own behalf, counsel asked the following questions:

"Didn't you marry at Sherman, and does not your license show, Mr. Watson, that you married under the name William Dick?"

Objection was made and overruled, and the question answered in the negative. And again counsel asked if the accused had not lived in Mississippi, near Holly Springs, which was answered in the negative. Then followed this question: "Well, of course, if you never lived in Mississippi you never killed a man in Mississippi, did you?" Objection was made and sustained, and counsel immediately asked the following question? "How many men have you killed in your lifetime?" Objection was made and sustained. The following extract from the cross-examination of the accused indicates the attitude of the prosecution in this case:

"Q. Didn't you ever live near Holly Springs, Mississippi? A. No, sir. Q. Well, what was your name when you lived in Alabama and Louisiana? A. C. H. Watson. (There had been no evidence that he ever had any other name than C. H. Watson.) Q. It never has been changed at all? A. No, sir. Q. What name did you marry under at Sherman, Texas, Mr. Watson? A. I married as C. H. Watson. Q. Didn't you marry at Sherman, and doesn't your license show, Mr. Watson, that you married under the name of William Dick? By Mr. McPherren: Objected to as immaterial. He stated that he married under the name of C. H. Watson. By the Court: The objection is overruled. By Mr. McPherren: To which the defendant excepts. A. I told you that was my name; I told you C. H. Watson. Q. You say that you got some money for your children, Mr. Watson? A. No, sir. Q. Never got any? A. No, sir; I did not. Q. Well, of course, if you never lived in Mississippi, you did not kill a man in Mississippi, did you? * * * Q. How many men have you killed besides Mr. Crabtree in your lifetime? * * * Q. Where did you marry your last wife? (There had been no proof that the accused ever had but one wife, and it was

afterwards in evidence that he never had but one wife.)    A. In Texas.    Q. In what county?    A. I told you a while ago.    Q. I don't recollect.    A. Comanche.    Q. Who was she?    A. Davis. Q. Was she the mother of these children you speak of?    A. Yes, sir.    Q. She was your second wife, however?    A. No, sir; she was my first wife.    * · *    *    Q. When you say you came to the picnic in Durant last year, did you bring your pistol with you? A. Yes, I was here at a picnic.    Q. Well, did you bring your pistol with you?    A. No.    *    *    *    Q. Now, I will ask you about whether or not you are in the habit of carrying a pistol with you anywhere?    A. No, sir.    Q. Did you ever carry a pistol with you anywhere?    A. I have a few times.    *    *    *    Q. Wasn't you in the habit of carrying that pistol with you every-where you went.    A. No, sir.    *    *    *    Q. There isn't any question about your having met Wesley Crabtree on the morning before?    A. I met him.    *    *    *    Q. You are just as certain about that as you are about any other fact in this case?    *    *    *    Q. To refresh my memory, Mr. Watson, I understood you to state yesterday afternoon that you had never lived in Grayson county, Texas?    A. No, sir.    Q. You did not marry in Grayson county? A. No, sir.    Q. What was your wife's name when you first married her?    A. Davis.    Q. Well, what Davis?    A. The widow Davis.    *    *    *    Q. I believe you stated to me on yesterday afternoon that you never had been married but one time?    A. No, sir.    *    *    *    Q. What was her maiden name?    A. Poff, I think.    Q. And you married her, you say, at that place?    A. Co-manche county.    *    *    *    Q. As soon—    As long as Wesley Crabtree had a case pending, an application pending for citizen-ship, he visited your daughter with your consent, did he not? A. No, sir.    Q. And isn't it a fact that, when his citizenship was turned down you told your daughter Ollie not to let him come any more?    A. No, sir."

In rebuttal, the state called Ollie Crabtree, daughter of the accused, and wife of the deceased, and asked her, among others, the following question: "What was your true name before you were married?"    Over the objection of the accused, she an-swered, "Ollie Dick."    And in answer to further questions, over objections and exceptions, stated that her father had told her that her name was Ollie Dick.

The assistant county attorney, who made the opening argu-ment for the state, made the following remarks, which it is con-tended were prejudicial: "Gentlemen of the jury, the defendant

in this case is a man living under an assumed name." Objection was made, and the court merely admonished counsel to stay within the record.

This statement was based upon the rebuttal testimony of Mrs. Ollie Crabtree. In our judgment neither the testimony nor the argument was proper. When the state asked Mr. Watson on cross-examination as to his true name, they were bound by his answer. If they were entitled to prove that he was a man living under an assumed name, and a fugitive from justice, as the sole purpose of this testimony and argument was, then they should have proven it in their case in chief, and we know of no rule permitting such procedure. There is no competent proof in the record to justify the prosecuting attorney in stating that the accused was living under an assumed name. Unless matters of this kind can throw some light on the issues involved, they should not be injected into a prosecution for murder.

In *People v. Derwae*, 155 Cal. 597, 102 Pac. 268, the Supreme Court of California, discussing the principle here involved, says:

"It may be that the assistant district attorney showed no heat or malice in his manner, and that the jurors made no demonstration indicating that their passions were aroused against the defendant, but we cannot see how, in spite of the prosecutor's suavity, the apparent imperturbability of the jurors, and the court's prompt declaration of the law, such gross misconduct could fail to make its impression."

The prejudicial conduct complained of in that case consisted in asking the following question:

"Did you have any trouble with one of your daughters while you were at Green Bay, Wis.? A. Not that I know of."

Then the assistant prosecuting attorney followed by asking the witness if he had not been guilty of certain other crimes, or questions suggesting that he had been guilty of other crimes. Objection was made and sustained, and the jury instructed not to consider it. See, also, *People v. Valliere*, 127 Cal. 66, 59 Pac. 295, which is a case almost on all fours with the one under consideration, and among other things the court says:

"In my opinion, the examination was inexcusable, and the statements contained in the closing address were an outrage

upon justice, which ought not to be allowed to pass. The court promptly rebuked the attorney, but that did not cure the injury. Rebukes do not seem to have any effect upon prosecuting officers, and probably as little upon juries. The only way to secure fair trials is to set verdicts so procured aside."

In *People v. Wells*, 100 Cal. 459, 34 Pac. 1078, decided by the Supreme Court of California in 1893, the prosecuting attorney asked the captain of police, who was being examined for the people, an improper question, stating at the time that the witness should not answer it until counsel had an opportunity to object. The question intimated that some one had come to this police officer and reported that the defendant wanted him to "tell the woman to skip." It was objected to, and the objection sustained, and the appellate court, in passing upon this, says, "What, then, was its purpose?" meaning the purpose of the prosecuting attorney in asking this question. Continuing, the court answers the question:

"Clearly to take an unfair advantage of appellant by intimating to the jury something that was either not true, or not capable of being proven in the manner attempted. And the wrong was not remedied because the court sustained an objection to the question. Counsel undoubtedly knew beforehand that the objection would be sustained. The inexcusable asking of the foregoing question would not be, perhaps, of itself, sufficient ground for reversing the judgment, but it is of importance, when taken in connection with the questions asked the defendant when a witness, as showing the general manner and temper with which the prosecution was conducted."

What was the purpose that moved the prosecutor to ask the accused in the case at bar on cross-examination, "Well, of course, if you never lived in Mississippi, you did not kill a man in Mississippi, did you?" And, "How many men besides Mr. Crabtree have you killed in your lifetime?" As said by the Supreme Court of California in the Wells case, *supra*:

"Its only purpose * * * was to get before the jury a statement in the guise of a question that would prejudice them against appellant. If counsel had no reason to believe the truth of the matter insinuated by the question, then the artifice was most flagrant; but, if he had reason to believe in its truth, still he knew that it was a matter which the jury had no right to

consider. The prosecuting attorney may well be assumed to be a man of fair standing before the jury, and they may well have thought that he would not have asked the question unless he could have proven what it intimated if he had been allowed to do so. He said plainly to the jury what Hamlet did not want his friends to say, as 'well we know'; or, 'we could, if we would.' * * * This was an entirely unfair way to try the case, and the mischief was not averted because the court properly sustained the objection—though we think it should have warned counsel against the course which he was taking—and instructed the jury specially on the subject. The wrong and the harm was in the asking of the question. Of course, in trials of criminal cases, questions as to the admissibility of evidence will frequently arise about which lawyers and judges may fairly differ in opinion, and in such cases defendants must be satisfied when courts sustain their objections. But where the prosecuting attorney asks a defendant questions which he knows, and every judge and lawyer knows, to be wholly inadmissible and wrong, and where the questions are asked without the expectation of answers, and where the clear purpose is to prejudice the jury against the defendant in a vital matter by the mere asking of the questions, then a judgment against the defendant will be reversed, although objections to the questions were sustained, unless it appears that the questions could not have influenced the verdict."

In the case of *State v. Trott,* 36 Mo. App. 29, the rule is. stated as follows:

"The state's attorney must have known that the answer called for by the question was inadmissible, and, if he knew it, the putting of such a question to the accused was so unfair and improper that it may well be doubted whether it could be deemed to have been cured by the prompt action which the court took."

If, in a misdemeanor case where a fine is the penalty on conviction, the rights of the defendant demand a reversal of the cause because of improper conduct of the prosecutor in asking improper questions, it must follow that, in a case where a citizen is being tried for his life, improper conduct of an identical nature will compel a reversal. This record, in addition to the above-quoted questions, furnishes abundant proof of a masterly effort to suggest to the minds of the jurors in an improper manner that the accused had been guilty of bad conduct and of crimes, and thereby engender prejudice against him. Knowing that the

rules of evidence did not permit such proof, and, consumed by a desire to convict the accused, apparently at all hazards, the ingenuity of the most fertile mind could not have conceived a more effective and damaging manner of poisoning the minds of the jurors with highly incompetent and prejudicial questions and suggestions.

In Kentucky, in the case of *Spencer v. Commonwealth*, 107 S. W. 342, 32 Ky. Law Rep. 880, quoting from the syllabus, the rule is laid down as follows:

"In a murder trial it was prejudicial error for the prosecuting attorney to repeatedly ask incompetent questions on cross-examination, intending to get before the jury the fact that, if the testimony of a witness at the examining trial could have been had on the main trial, it would have established accused's guilt, and to repeatedly ask accused, 'Didn't you, two months before you killed this girl, try to cut her throat?' such questions calling for incompetent testimony where, after sustaining the objections, the court did not rebuke the attorney, nor admonish the jury to disregard the questions and the supposed answers that might have been expected."

The court in the opinion in the above case, after calling attention to the improper questions asked by the prosecuting attorney, says:

"This court has more than once condemned the asking of questions by the commonwealth's attorney intended to bring out incompetent evidence. Thus in *Baker v. Commonwealth*, 106 Ky. 212, 50 S. W. 54, it is said: 'Counsel for the commonwealth should aid the court in keeping from the jury all testimony which the court had ruled to be incompetent, for, though testimony which reaches the jury be excluded by direction of the court, the impression, especially if the statement if often repeated, is likely to remain on the minds of the jury.' Again, in the recent case of *Shipp v. Commonwealth*, 124 Ky. 643, 99 S. W. 945, 30 Ky. Law Rep. 904, 10 L. R. A. (N. S.) 335, it is said: 'The fourth and last assignment of error presented by appellant's counsel is that of misconduct of employed counsel for the commonwealth during the trial. While it is true that the court sustained appellant's objections in every instance, during the trial, to improper questions, they were repeated so often they must necessarily have left an impression upon the minds of the jury hurtful to appellant. This conduct of counsel was reprehensible,

and the court should have prevented it.' In a still more recent case (*Marcum v. Hargis,* 104 S. W. 695, 31 Ky. Law Rep. 1117), the evils of such misconduct on the part of counsel are pointed out in the following language: 'It cannot be doubted that in jury trials incalculable harm is often done by counsel in asking known incompetent questions in the hearing of the jury, and thereby forcing the adverse party to object to them, also in the hearing of the jury, which manifests his fear of the incompetent questions, and gives emphasis to the harmful matter they are supposed to contain.' "

Again, in the case of *Gargill v. Commonwealth,* 13 S. W. 916, 12 Ky. Law Rep. 149, this rule is sustained. The court says:

"The attorney for the state should have been at once stopped and prevented from asking this question. It had the effect to prejudice the jury, and must have been asked for that purpose; and the fact that the court refused to permit the question to be answered did not remove the effect it might and probably did have on their minds."

And again, in commenting on this line of procedure, the court says:

"The trial judge cannot always determine the propriety of a question until it is fully propounded; but often, when the attorney persists in asking questions that are clearly incompetent, the court, before counsel has gone far enough to require the answer, or to produce the effect desired on the jury, must see that the question is clearly incompetent, and should interpose. that a fair trial, or one at least according to the forms of law, may be had."

Another Kentucky case is *Baker v. Commonwealth,* 106 Ky. 212, 50 S. W. 54, and in that case the court laid down this proposition:

"Nor is it competent to ask the defendant questions whose only possible object is to excite in the minds of the jury a suspicion that he has been guilty of other offenses than the one for which he is being tried. Nor do we think it was competent to interrogate appellant in regard to a transaction which took place more than 15 years before, when he was a very young man."

Further along in this decision we find the following:

"Counsel for the commonwealth should aid the court in keeping from the jury all testimony which the court has ruled incompetent, for, though testimony which reaches the jury be excluded by direction of the court, the impression, especially if the state-

ment is often repeated, is likely to remain on the minds of the jury."

In *Commonwealth v. Nicely,* 130 Pa. 261, 18 Atl. 737, the Supreme Court of Pennsylvania lays down the doctrine as follows:

"It is difficult to measure the amount of zeal which is allowable, or, at least, excusable, on the part of counsel engaged in the defense of a man who is upon trial for his life. Writers upon professional ethics differ upon this subject, and I will not discuss it. We have no difficulty, however, in measuring the extent of zeal which counsel for the commonwealth may properly display upon such occasions. The district attorney is a quasi judicial officer. He represents the commonwealth, and the commonwealth demands no victims. It seeks justice only—equal and impartial justice—and it is as much the duty of the district attorney to see that no innocent suffers as it is to see that no guilty man escapes. Hence he should act impartially. He should present the commonwealth's case fairly, and should not press upon the jury any deductions from the evidence that are not strictly legitimate. When he exceeds this limit, and in hot zeal seeks to influence them by appeal to their prejudices, he is no longer an impartial officer, but becomes a heated partisan. When that officer allows private counsel to assist him in the trial of a cause, such counsel represents him to that extent, and should be governed by the same rules of propriety."

In *Hurd v. People,* 25 Mich. 405, it was said by Chief Justice Christiancy:

"His object, like that of the court, should be simply justice; and he has no right to sacrifice this to any pride of professional success. And, however strong may be his belief of the prisoner's guilt, he must remember that, though unfair means may happen to result in doing justice to the prisoner in the particular case, yet justice so obtained is unjust and dangerous to the whole community."

See, also, *Curtis v. State,* 6 Cold. (Tenn.) 11, and *State v. Sanford,* 1 Nott & McC. (S. C.) 512.

In Arkansas, the case of *Holder v. State,* 58 Ark. 473, 25 S. W. 279, seems to be the leading case on the question under consideration, and we quote from that case the following:

"The action of the attorney for the state was highly reprehensible. A prosecuting attorney is a public officer, 'acting in

a quasi judicial capacity.' It is his duty to use all fair, honorable, reasonable, and lawful means to secure the conviction of the guilty who are or may be indicted in the courts of his judicial circuit. He should see that they have a fair and impartial trial, and avoid convictions contrary to law. Nothing should tempt him to appeal to prejudices, to pervert the testimony, or make statements to the jury which, whether true or not, have not been proved. The desire for success should never induce him to endeavor to obtain a verdict by arguments based on anything except the evidence in the case and the conclusions legitimately deducible from the law applicable to the same. To convict and punish a person through the influence of prejudice and caprice is as pernicious in its consequences as the escape of a guilty man. The forms of law should never be prostituted to such a purpose. In the case before us, the prosecuting attorney was provoked by the attorney for the defendant to defend his examination of the defendant while on the witness stand. The court admonished him that his remarks were improper, and instructed the jury not to take them into consideration. This, under the circumstances, might have been sufficient, if he had heeded the admonition of the court and refrained from making further remarks of like character. But he still persisted in the course he had taken, and the court, for the second time, instructed the jury 'that they should consider only the law as given them, and the evidence of the witnesses, in arriving at a verdict.' The prosecuting attorney doubtless did not intend to commit a wrong, but, upon the impulse of the moment, sought to defend himself against the attack of opposing counsel. He did wrong. He should have desisted from continuing the objectionable remarks when the court admonished him that they were improper. But he did not Under such circumstances, the administration of justice, the enforcement of the laws, the dignity and authority of the court, demanded a severer penalty for the wrong than a mild rebuke. The provocation was no excuse or justification. A punishment sufficient to impress the jury with the fact that the remarks were improper, and should not be considered by them, to command respect, and to maintain the dignity and authority of the court, and to prevent a repetition of the offense, however unpleasant to the court, should have been imposed. The appellant was accused of having caused his wife to take the poison which caused her death, and the evidence adduced at the trial tended to prove the accusation. His testimony offered the only explanation consistent with his innocence as to how she was poisoned, and his acquittal depended in a large measure, if not solely, on his

credibility. The remarks of the prosecuting attorney, if be-
lieved, tended to discredit him. How far they did so depended
on the credence the jury gave to them. Coming from a person
occupying the position of prosecuting attorney, and apparently
founded on the letter to which he referred when he cross-ex-
amined the defendant, they were well calculated to prejudice
the appellant in his trial before the jury. The persistence of the
state's attorney in defending his action by the assertion that he
had reliable information from sources other than the letter as
to the subject-matter of his cross-interrogatories increased the
prejudice by causing the jury to give less weight to appellant's
testimony. They might have thought he was warranted in doing
so on account of reliable information he had received, from the
fact he earnestly insisted, in defiance of the court, that he had
been reliably informed that that which his interrogatories im-
plied was true. As a general rule 'an objection by the opposing
counsel, promptly interposed, followed by a rebuke from the
bench, and an admonition from the presiding judge to the jury
to disregard prejudicial statements,' is sufficient to cure the pre-
judice. But when we consider the earnest, persistent, and vigor-
ous manner in which the prosecuting attorney attacked the cred-
ibility of the defendant by assertions and means unsupported
by the evidence, and the mild reproof of the court, we are not
prepared to say that the prejudice was cured in this case."

In *State v. Irwin*, 9 Idaho, 35, 71 Pac. 608, 60 L. R. A. 716,
the Supreme Court of Idaho cites numerous authorities and goes
into the conduct of a prosecuting attorney at length, and, after
citing some questions asked of the accused, the court says:

"Why, then, did he ask them?" (and answering says:) "And
if the questions and answers did not help strengthen the case
against the defendant, why did not the prosecution consent to
have them stricken out? It is quite evident that the questions,
and not the answers, were what the prosecution thought impor-
tant. The purpose of the questions clearly was to keep persist-
ently before the jury the assumption of damaging facts which
could not be proven, and thus impress upon their minds the
probability of the existence of the assumed facts upon which the
questions were based. To say that such a course would not be
prejudicial to defendant is to ignore human experience and the
dictates of common sense."

In *Martin v. State*, 63 Miss. 505, 56 Am. Rep. 812, the court
laid down the doctrine on the question here involved, as follows:

"After an objection has been sustained to an improper question propounded on the cross-examination of the defendant, the repeated asking by the prosecuting attorney of similar questions, notwithstanding the sustaining of the objections thereto, and his action in excepting to the rulings of the court thereon, constitutes misconduct on the part of the prosecuting attorney prejudicial to the substantial rights of the defendant, for which a conviction will be reversed; although such conduct was reprimanded by the court, and the jury directed to disregard the same."

In the case under consideration, incompetent and highly prejudicial questions were repeatedly asked of the accused. The conclusion is irresistible that the whole purpose of these questions was to keep before the jury an assumption that the accused had, prior to the killing of Crabtree, killed other men, and was at the time of the trial a fugitive from justice living under an assumed name to avoid detection and punishment. See *Gale v. People,* 26 Mich. 157; *People v. Chuck,* 78 Cal. 317, 20 Pac. 719; *People v. Devine,* 95 Cal. 227, 30 Pac. 378; *People v. Ah Len,* 92 Cal. 282, 28 Pac. 286, 27 Am. St. Rep. 103; *People v. Bowers,* 79 Cal. 415, 21 Pac. 752.

It is further contended by counsel for the accused that the county attorney was guilty of prejudicial conduct, and the court committed reversible error in permitting him to indulge in abusive and improper language and unfair argument. The entire closing argument of the county attorney, who is an able and vigorous prosecutor, is included in the record. The following extracts are taken therefrom:

"You have heard the testimony in this case. I believe that our witnesses, the witnesses that the state introduced on the witness stand, told the truth as it happened. Did Lambert tell the truth? Did the other witnesses for the state tell the truth? Yes! Do you believe that Lambert testified falsely? You have heard Lambert's testimony and know what he stated before you. You saw him here on the witness stand. Lambert is a good man; he is as good a man as there is in Bryan county; yes, in the entire state of Oklahoma, and I believe him to be an honest man. Gentlemen of the jury, you have heard the evidence in this case; you know what it is. *You believe that the defendant is guilty._ He is guilty of murder and ought to suffer for it. The people in this courtroom are here demanding that justice*

*be meted out to this defendant, and I know that you will do it when you retire to deliberate upon your verdict in your jury room.* * * . * Gentlemen of the jury, this defendant is guilty, and you, by your verdict, should find him guilty. He should be found not only guilty, but the extremest punishment should be meted out to him."

Among many other comments on the absence or existence of a certain witness named McDonald, whom the accused contended was present at the scene of the homicide, the county attorney made the following:

"If there was such a man as McDonald, counsel would have never let him go to trial without his presence. If McDonald had not been an imaginary creature, the defendant's attorneys would have been filing a motion for a continuance of this case. Gentlemen, you know what this testimony is, and when you get to your jury room let your verdict speak. If this man McDonald was there, somebody would have known it. * * ' * They knew there was no such man as McDonald. Don't you know that if they knew about this McDonald, or there was a McDonald, as Mr. Watson says there was, that they would have filed a motion for a continuance in order to take his testimony. If there had been such a man, his counsel would have never let him go to trial. When Watson testified to this man McDonald, we put the sheriff's force to work to find out where certain parties were that time."

Mr. McPherren, of counsel for the accused, made the following request:

"I desire, at this time, the court to instruct the jury that the remarks of counsel, in which he stated that, if McDonald had not been an imaginary creature, the attorneys for the defendant would have filed a motion for a continuance. The testimony shows that McDonald was a resident of Louisiana, and not a resident of the state of Oklahoma, and the law being so clear that no motion for a continuance would be well founded for a witness that lived outside of the jurisdiction of the court, and witness of whom the testimony shows that the defendant did not know anything of his whereabouts, I therefore ask the court to instruct the jury that they are to disregard the remarks of counsel to that effect. By the Court: The statement of counsel in regard to a motion for a continuance on account of the absence of Mr. McDonald is withdrawn from your consideration, and you are admonished not to take the same into consid-

eration. By Mr. McIntosh: I would like to make a few state-- ments further, if the court please. By Mr. McPherren: He has already closed his argument. Mr. McIntosh: They could have taken his deposition if there had been such a man. By Mr. McPherren: The gentleman is not sworn. He desires to stand here in the presence of this jury and make a statement that he doesn't know anything about. The record shows that the defendant wrote him letters; he couldn't learn his whereabouts; and I do not know of any method under which the deposition of a witness can be taken whose whereabouts are unknown, and we ask the court to instruct the jury not to pay any attention to that statement. By the Court: The remarks of counsel in regard to that is withdrawn from your consideration, gentlemen of the jury, and you are admonished and instructed not to consider the same. By Mr. McPherren: The defendant further objects to all the remarks of the county attorney in which he traveled out of the record, commented upon the nature of the defendant's offense, calling him an assassin, and testified as to the credibility of the witnesses, and expressed his opinion and belief as to the defendant's guilt. By the Court: Objection sustained, and the jury are instructed not to give any weight to matters outside of the record."

The statements quoted above are only a few of the many submitted to the jury in argument by counsel for the state. Newly elected prosecuting officers are sometimes overzealous and appear to be carried away with the idea that they must secure convictions, forgetting that their highest obligation is their duty to be fair alike to the state and the accused. In the case under consideration, however, each of the three attorneys for the state were men of experience and able lawyers. Improper and prejudicial conduct on the part of public officials of that character is more serious than if indulged in by one not accus-. tomed to the duties of public prosecutor. We do not want to be understood as saying that counsel were possessed of improper motives, but the record clearly indicates that they were entirely more zealous than the situation demanded or the law permits.

In *Cox v. State*, 2 Okla. Cr. 668, 104 Pac. 378, this court laid down the following rule:

"Attorneys on either side in their arguments ought not to go out of the record, and they ought not to throw into the

scales with the evidence their personal and official opinion and desire as to what should be done. The prosecuting attorney in closing the argument should be confined to a reply to the legitimate argument on the part of the defense, and a fair discussion of matters in the record. The average juror holds in high regard, and properly so, the regularly elected prosecuting attorney. The people by electing him have reposed great confidence in his ability and integrity, and the power thus given him must not be used to supply the lack of evidence, or to make greater the weight of the evidence in any case. The authorities are numerous as to what constitutes improper conduct. They are uniform in holding any statement improper that is calculated to inflame the mind of the jurors, arouse their prejudice, or appeal to their passions."

The jury in the trial of a criminal case are not to consider any facts except those which have been proven by the witnesses on the stand or the exhibits admitted in evidenc eby the court. If this sound and well-established principle is to be disregarded in the trial of some particular person who is considered guilty, we tear down one of the safeguards provided by society for the protection of its citizens, and such a precedent might lead to depriving an innocent man of his life or his liberty. And, even though the accused in this case was guilty of murder, he was entitled to a fair and impartial trial and a judgment of conviction, and the imposition of a life sentence would be as great a wrong to society, if unfairly secured, as it would be to permit the accused, if guilty, to go unwhipped of justice.

In *Martin v. State,* 63 Miss. 505, 56 Am. Rep. 813, the Supreme Court of Mississippi says:

"A jury trial should be conducted according to the law of the land, and the verdict of the jury should in all cases be a true response to the issue joined, according to the law and the evidence. It is among the highest of judicial functions to see that the law is impartially administered and to guard the jury box as far as possible from unlawful influences. Much latitude is accorded to the discussion of counsel in performing duties which they owe to clients and to public justice. In its proper sphere, the argument of counsel to the jury is subject to no censorship or restriction by the court, but it should never be permitted to degenerate into wanton abuse or unauthorized license. Within the limits of the testimony, the argument of counsel is and should

be free, but that freedom does not extend either to the statement or the assumption of facts, or to commenting upon facts not in evidence, to the prejudice of the adverse party."

See, also, *Vaughan v. State,* 58 Ark. 353, 24 S. W. 885, *Cavanah v. State,* 56 Miss. 299, *Cross v. State,* 68 Ala. 476, and *State v. Smith,* 75 N. C. 306.

In the case of *Vickers v. United States,* 1 Okla. Cr. 452, 98 Pac. 467, this court, in an opinion by Doyle, J., says:

"A public prosecutor is presumed to act impartially in the interest only of justice. If he lays aside the impartiality that should characterize his official action to become a heated partisan, and by vituperation of the prisoner, and appeals to prejudice, seeks to procure a conviction at all hazards, he ceases to properly represent the public interest, which demands no victim, and seeks no conviction through the aid of passion, sympathy, or resentment. The only way to secure fair trials is to set aside verdicts so procured."

See, also, *People v. Lange,* 90 Mich. 454, 51 N. W. 534.

Upon a careful consideration of this record, we are impelled to the conclusion that the accused did not have a fair and impartial trial. We again warn the trial courts and prosecuting attorneys in this state that they must conduct the trials of criminal cases in a fair and impartial manner and according to the rules of law. The public is entitled to an impartial enforcement of its penal statutes. In the interest of the law-abiding public, this court has used every reasonable means to uphold judgments of conviction when in good conscience it could so do. But the aversion of this court to reversing judgments of conviction must not be understood by the trial courts and the prosecuting attorneys as a license to disregard the rights of persons on trial accused of crime. The trial of criminal cases must be conducted according to law. When the record discloses that a trial has been unfair, as the record in this case does, a judgment of conviction cannot be upheld, although this court, with reluctance, is forced to award a new trial at the expense of the people.

The judgment is reversed, with direction to grant a new trial.

FURMAN, P. J., and DOYLE, J., concur.