Robert C. AYCOCK, Plaintiff in Error,

v.

The STATE of Oklahoma, Defendant In Error.

No. A–13089.

Court of Criminal Appeals of Oklahoma.

Feb. 7, 1962.

Geb & DeFord, Ponca City, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Ralph C. Haynes, County Atty. Kay Co., Ponca City, for defendant in error.

NIX, Presiding Judge.

Robert C. Aycock, hereinafter referred to as the defendant, was charged by information in the county court of Kay County, with the crime of driving a motor vehicle while under the influence of intoxicating liquor. He was tried before a jury, found guilty and was sentenced to 10 days in the county jail and to pay a fine of $50.

Defendant lodged his appeal within the time prescribed by law and filed his brief herein arguing three propositions of error which will be discussed in the order set forth in the brief of defendant.

The case arose from circumstances testified to by Patrolman Moore who stated he was patroling Highway 60, East of Ponca City, at night, when he met defendant driving about 70 miles per hour while two feet on the wrong side of the road. Trooper Moore turned around and pursued defendant, stopped defendant with the aid of the red light and siren. The testimony as to the incident was as follows:

> "Then I observed the car in about a half a mile there as going across the center line on two or three occasions and going at least half or over that

distance driving on the shoulder of the road.

"Q. About how far did you follow this automobile?

"A. About a half a mile.

"Q. When did you put him under arrest? You said you put him under arrest?

"A. After he got out of his automobile.

"Q. Did you have an occasion to observe him when he got out of his automobile?

"A. Yes, sir.

"Q. Did you have an occasion to observe his walk, his talk and his demeanor at the time he got out of his automobile?

"A. Yes, sir.

"Q. All right. After he got out of the automobile, what else did you do and he do?

"A. We went to the rear of the car and I placed him under arrest for driving while intoxicated and I asked for his drivers license and he gave them to me after some time in his billfold and I dropped his drivers license and asked him to pick it up and he picked it up, but had some time fumbling on the ground picking it up. Then after he give me the drivers license, I took him back and helped him in the patrol car because he was in such an intoxicated condition that I didn't want him to walk alone, he might fall in a ditch. So I took him by the arm and took him back to the right side of the patrol car and put him in the right front seat."

He further testified as follows:

"A. And then I helped him inside the patrol car to get in and this time while I was helping him he leaned against me to help steady himself on his feet.

"Q. Mr. Moore, did you have any conversation with this man out there that night?

"A. Yes, sir.

"Q. Do you recall at this time what that conversation might have been?

"A. I can recall some of it, sir.

"Q. Will you recall for the Court and jury and repeat what conversation you had with him?

"A. I asked the defendant where he had been and he state he had been to Tonkawa and had been there from about twelve noon with two other men and that they had been driving around and had been to two different taverns and that about four o'clock that one of the men passed out drunk and they took him home. And then he stated that they had bought whiskey on two separate occasions and I asked him how much he had drank and he said he had drank about one pint his self of Old Grandad. And he stated that when he left Tonkawa that he left by his self and I asked him if he was drunk when he left Tonkawa and he stated that he had been drunk ever since he was on U. S. 60. He asked me what he was being charged with and I advised him that he was being charged with driving while under the influence of an intoxicant and he said—his words were: 'Hell, put down drunk, that's what it is'.

"Q. That was his words, was it?

"A. Yes, sir.

"Q. Mr. Moore, how long have you been a highway patrolman trooper?

"A. I've been a trooper for over eight years.

"Q. During that time, have you had occasion to observe any people who were under the influence of intoxicating liquors?

"A. Yes sir, I have.

"Q. Has that been numerous or just a few?

"A. Well, that's been numerous in eight years, sir.

"Q. Probably how many would you observe in one year's time, if you can estimate it?

"A. Oh, twenty-five–fifty.

"Q. And you've done that for eight years?

"A. Yes, sir.

"Q. Do you think you are able to state to this jury and to this Court at this time an opinion, after observing this man that night, as to whether he was drunk or sober?

"A. Yes, sir, I do.

"Q. I'll ask you, Mr. Moore, what that opinion is?

"A. I was of the opinion that he was drunk without a reasonable doubt.

"Q. Would that mean just partially drunk, borderline case drunk or very drunk?

"A. That means he was very drunk." Defendant admitted being stopped and arrested by the patrolman but denied being drunk at the time and produced certain witnesses to support his defense. Mr. Robert Campbell testified defendant came by his home during the afternoon of December 31, 1959, to see about buying some hay. That he and the defendant purchased a half pint of whiskey and had one drink a piece. That defendant arrived at his house in a sober condition and left about 4:00 p. m. and was not intoxicated at the time of departure. That defendant was walking on crutches at the time and was complaining of a broken ankle.

Donald Burns testified on the day in question defendant came by his house about 4:30 p. m. They had been friends for some time and defendant came to visit; while there they went out to the river and with a .22 pistol engaged in target practice. That in his opinion defendant was not under the influence of liquor. That defendant was walking on crutches as a result of a broken ankle. That during the time they were together there was no drinking and he saw nothing to drink during the time, and that defendant appeared normal with exception of being on crutches. That they parted company about 6:15 p. m.

According to John Williams, defendant came by his house at supper time some where around six. He remembered the date as the day defendant was arrested. That defendant stayed about thirty minutes. He left advising the witness Campbell that he needed some tires and was going to the A-1 Service Station East of Tonkawa. That defendant did not take a drink while there. That he could smell an odor of alcoholic beverage, but defendant was not intoxicated upon leaving his home.

Charlie James testified he was the operator of the A-1 Service Station and that about 8 p. m. on the night in question defendant came in his station and bought a pair of tires, Spartans—800 x 14's. That defendant was on crutches at the time and that he helped defendant into the station to keep him from slipping on the ice. That defendant drank nothing while there and did not appear to be under the influence of liquor. That the only difference in defendant's appearance then and before was the fact defendant was on crutches.

Defendant took the stand in his own behalf and reiterated the numerous visits as related by those who testified for the defense. He admitted that he visited with Bob Campbell and that they purchased a half pint of whiskey and had one drink and left Bob's company about 4 p. m. He confirmed the testimony of Charles James that defendant purchased two tires at the A-1 Service Station, had them put on his '57 Plymouth and started home and was picked up by the patrol. He further testified he was suffering from a fractured ankle and was using crutches at the time and had a cast on his right foot. As to the arrest he testified as follows:

"Q. All right. Now, after the highway patrol stopped you out there on the road, what happened?

"A. Well, he come up and told me to get out of the car and I told him if he wanted to go back in his car I would, but I wasn't standing out in the cold weather and so he come up there and he never helped me back to his car.

On them crutches, I could get along better if everybody would just stay away and leave me alone and let me go by myself. And we went back and set down and I got in the back seat of his car and he set up in the front seat and there was another guy with him. I don't know what this other character was doing but any how, he told me he was going to have to take me in and he wanted to see my drivers license and so he brought up the deal that he had to call a wrecker for the car and I tried to get him to let me drive it or let this other guy drive it and no, that wouldn't do, he had to call a wrecker out there for the car and I don't know just how long we did set there.

"Q. All right. You heard the testimony of the highway patrol this afternoon to the effect that he asked what— you got out of the car for your drivers license and after you gave it to him, he dropped it and you reached down and picked it up. Now, is that what happened?

"A. No, sir.

"Q. Will you tell the Court and the jury what happened out there?

"A. Well, he come up to the car and told me to get out and I told him that I wouldn't get out and stand in that cold weather on account of that cast and the wind would hit it and they cautioned me quite a little bit about pneumonia in my leg and so he finally told me to come back to his car and I got in the back seat of his car and I took my drivers license out and showed 'em to him. Then that's when he told me I was under arrest and that he'd have to call a wrecker out.

"Q. All right. Did you hear the testimony of the highway patrol this afternoon to the effect that you cursed a great deal and the fact that you said that you put somebody to bed at four o'clock?

"A. Yes, sir. I heard a lot of other stuff that I don't know where they—

"Q. Was that true?

"A. No, sir."

Defendant denied that he was intoxicated as follows:

"Bob, at the time you were arrested by this highway patrolman that testified earlier in the afternoon, were you intoxicated?

"A. No, I might have been kind of dizzy-headed because I remember—I think I took one of them little pills— they give me pain pills whenever my ankle started hurting that I take them and it would about half way ease the pain and as far as being drunk, one drink that early in the afternoon I don't think is going to hurt anybody."

Patrolman Moore was recalled by the state and his testimony provides the argument for defendant's first contention of error. Moore's testimony upon rebuttal was as follows:

"Q. Mr. Moore, are you familiar with the automobile that this man was driving when he was arrested?

"A. Yes, sir.

"Q. Have you seen that automobile since that date?

"A. Yes, sir.

"Q. When was the last time you saw that automobile?

"A. This morning.

"Q. Did you have the occasion to see the automobile any time yesterday?

"A. Yes, sir.

"Q. Did you have occasion to check the tires that are on that automobile?

"By Mr. Geb: To which we object. Immaterial and irrelevant; has nothing to do with the crime a year ago—checking the tires here unless he can show some connection with driving while under the influence.

"By Mr. Welch: Your Honor, the defendant's witness—

"By Mr. DeFord: Your Honor, we would ask one thing. This was thirteen months ago that this act took place.

The tires yesterday would not have reference—

"By the Court: I think the tires came into this case and I think it might have some—until we hear more about it, it's possible that it would have some bearing in this case.

"By Mr. DeFord: We would like the Court to keep in mind that it was thirteen months ago.

"By the Court: Objection overruled.

"By Mr. DeFord: Let the record show an exception to the Court's ruling.

"By Mr. Welch: Q. What size tires is it that that automobile has on it and the automobile uses?

"A. It has 750 14's.

"Q. And what kind of tires does the car have on it at this time?

"A. I only checked the rear tires and they are Goodyear.

"Q. Goodyear? Are they new tires or are they—what's the condition of the tires?

"A. The tires are about wore out, sir.

"Q. You would say they were old tires, is that right?

"A. Yes, sir.

"Q. Mr. Moore, do you recall what day of the week it was that you arrested the defendant?

"A. It was on a Thursday, December 31st, 1959.

"I believe that's all."

Defendant contends that admitting Moore's testimony as to the tires on defendant's auto some fifteen months after the arrest was irrelevant and immaterial, was collateral to the issue, too remote and was prejudicial to defendant's rights. Defendant cites no case in point. However, he quotes from 20 Am.Jur. §§ 249, 250, as to the admissibility of evidence remote in point of time. Section 249 reads:

"Evidence which is otherwise competent may relate to facts too remote in point of time or matters too far removed from the scene of the transaction to be admissible. The admissibility of such evidence is a matter resting largely in the discretion of the trial court."

We are in accord with this statement of the law but do not feel that the court abused its discretion in admitting this testimony. It no doubt was an attempt to discredit the witness in his testimony as to the purchase of the tires on the night of the alleged offense. Defendant was recalled and explained that the tires on the car at the time of the trial were not the same as the ones at the time of his arrest. He testified upon being recalled as follows:

"Q. Now, the County Attorney's office had the patrolman check the tires on two occasions down there, and for the benefit of the Jury, will you tell the Court the circumstances around the tires—do you still have the same tires you had thirteen months ago—a little over thirteen months ago?

"A. No, sir, that left hand front wheel is the only one that is still with the car that was with it at that time and at that time, it was a spare in the trunk. And since then it's had all new tires all the way around it.

"Q. And what size are they?

"A. They're 750's now. I went up to 800's that one time and I was advised to go back down to 750's.

"Q. Now this is the same automobile you had before, isn't that right?

"A. Yes."

During the trial defendant testified he gave a check for the tires. Had defendant produced the check no doubt the controversy would have resolved itself in defendant's favor. However, since defendant had an opportunity to give a plausible explanation as to why the tires were not the same, we fail to see where the trial court abused its discretion in admitting the testimony or that defendant was prejudiced thereby.

■ Defendant next argues that defendant was prejudiced during the testimony of Patrolman Moore. The county attorney attempted to hand to witness Moore a paper with notes made by Moore the night of the arrest to refresh his memory. Defense objected for the reason said papers had' been marked as an exhibit, arguing that the county attorney was attempting to give official status to the paper which was only a copy of the notes made by the patrolman. We can attach little significance to the contention as the court made it clear to the jury that it was only for the purpose of refreshing the memory of witness Moore. After the objection the court inquired of the county attorney as follows:

"By the court: Are you giving it to him to refresh his memory or are you attempting to introduce it into evidence?

"A. I believe the only thing it is competent for is to refresh his memory, Your Honor.

"The court further said:

"It's not an official record. It doesn't go to the jury until it's received in evidence."

The paper was never offered in evidence and the jury was apprised that it constituted no part of the evidence. The apprisal was made in the following language after the jury had made inquiry, after some deliberation, if they could take the pink slip to the jury room.

"By the Court: The pink slip was not introduced and admitted into evidence and it would not be proper to turn anything over to the jury which is not properly admitted into evidence, so I would not be able to turn that particular slip over to you. You will have to decide the case according to the evidence that came from the witness stand and according to the exhibits that actually were introduced into evidence and received into evidence * * *."

This admonition should have amply advised the jury that they were not to consider the pink slip as evidence in the determination of the issues. We therefore, fail to see where defendant was prejudiced by it being used to refresh the memory of witness Moore.

■■ Defendant's most serious contention involves the conduct of the county attorney in his presentation to the jury in his closing argument. The incident complained of is related in the transcript at the outset of the county attorney's closing argument as follows:

"County Attorney: I would like to say at the outset that, in my opinion, this defendant is lying on the witness stand and I will tell you why I think he is lying.

"By Mr. Geb: We'd like to move for a mistrial on that basis.

"County Attorney: Your Honor, the counsel can make their own observations upon the evidence—upon the testimony—

"Mr. Geb: There are things that are proper. We just want to ask—

"By the Court: Overruled.

"Mr. Geb: Let the record shown an exception."

The Court agrees with defense counsel that this constitutes improper argument and that county attorneys should not indulge in such tactics. The statement standing alone is not sufficient to justify a mistrial. The county attorney could have conveyed his opinion in more diplomatic language. It besmirches the dignity of the county attorney to depict one as a *liar* while shrouded with the cloak of his office. He has a right to express his opinion as to the veracity of the testimony, but in the ultimate end the jury is to determine what credence to place upon the testimony of a witness. In the instant case the fault does not lie in expressing an opinion but in the language used in so doing. These type tactics are frowned upon by the Court and was well stated in the case of Watson v. State, 7 Okl.Cr. 590, 603, 124 P. 1101, 1106, where the Court said:

"A prosecuting attorney is a public officer, 'acting in a quasi judicial capacity.' It is his duty to use all fair, honorable, reasonable, and lawful means to secure the conviction of the guilty who are or may be indicted in the courts of his judicial circuit. He should see that they have a fair and impartial trial, and avoid convictions contrary to law. Nothing should tempt him to appeal to prejudice, to pervert the testimony, or make statements to the jury which, whether true or not, have not been proved. The desire for success should never induce him to endeavor to obtain a verdict by arguments based on anything except the evidence in the case and the conclusions legitimately deducible from the law applicable to the same. To convict and punish a person through the influence of prejudice and caprice is as pernicious in its consequences as the escape of a guilty man. The forms of law should never be prostituted to such a purpose."

Though the statement was reprehensible it is difficult to say that defendant was prejudiced thereby to the extent of requiring reversal. There was competent evidence upon which the jury based their verdict. The conflict in the testimony was determined in favor of the state. The maximum penalty prescribed by law for the crime charged is a fine of $500.00 and one year in the Oklahoma State Penitentiary. The minimum punishment is 10 days in the county jail. The punishment assessed by the jury was 10 days in jail plus a $50.00 fine.

In view of such a verdict prejudice is not indicated. The judgment and sentence of the trial court is therefore affirmed.

BRETT and BUSSEY, JJ., concur.