### WILLIE McBROOM v. STATE.

No. A-4229.     Opinion Filed March 22, 1924.
(224 Pac. 210.)

(Syllabus.)

1. **Continuance—Denial Where no Likelihood of Obtaining Attendance of Witness.** A motion for a continuance on account of the absence of a witness for the defendant is properly denied, where there is no showing of any greater likelihood of obtaining the attendance of the witness at a subsequent term of court should the cause be continued.

2. **Assault and Battery—Right of Relative or Third Person to Defend Another.** One who goes to the aid of a relative or third person acts at his own peril, and his right to defend the other is coextensive with the other's right to defend himself at the time.

3. **New Trial—Improper Remarks of Counsel Prejudicial.** Improper remarks of a prosecuting officer, objected to at the time, will be considered and construed in reference to the evidence, and, if it appears that the improper argument may have determined the verdict, a new trial should be granted.

Appeal from District Court, Cherokee County; J. H. Jarman, Judge.

Willie McBroom was convicted of assault with a dangerous weapon, and he appeals. Reversed and remanded.

On the 18th day of January, 1921, the county attorney of Cherokee county filed in the district court thereof an information against the plaintiff in error, Willie McBroom, the charging part of which is as follows:

"That is to say, the said William McBroom, in Cherokee county, state of Oklahoma, then and there being, did, then and there, on or about the 3rd day of November, 1920, knowingly, willfully, unlawfully, and feloniously make an assault and battery upon one A. C. Howell with a certain knife, said knife being then and there a dangerous and deadly weapon in the hands of the said William McBroom, and did, then and there, with said knife strike, cut, and stab the said A. C. Howell in and upon the neck, chest and face, in a manner reasonably calculated to produce death, with the unlawful and felonious intent then and there to kill the said A. C. Howell, contrary to the form of the statutes, in such cases made and provided, and against the peace and dignity of the state."

Thereafter the defendant was arraigned and entered a plea of not guilty, and on the 7th day of September, 1921, the cause was called for trial and the defendant moved to continue the cause because of the absence of one Os Neal, whom he alleged to be a material witness in his defense. The motion for a continuance was overruled and excepted to. The cause then proceeded to trial and resulted in a verdict of guilty of assault with a dangerous weapon, with punishment fixed as above stated. A motion for a new trial was filed and overruled, and on the 8th day of September, 1921, judgment was pronounced against the defendant in accordance with the verdict.

An appeal was prayed for and time allowed for perfecting the same, and the petition in error and case-made were filed in this court on the 6th day of March, 1922.

The assignments of error relied upon may be grouped as follows: (1) Error of the court in overruling the motion for a continuance on account of the absence of the witness Os Neal. (2) Error of the court in giving certain instructions excepted to, and in refusing to give requested instruction. (3) Prejudicial argument on the part of special counsel employed to assist in the prosecution. (4) Failure of the trial court to fully instruct the jury as to the law of the case.

In order to present understandingly the propositions of law urged as a basis for the reversal of this judgment, it is necessary to state concisely enough of the facts to present the issues upon which this case was tried.

This prosecution was the result of a controversy between one A. C. Howell and one I. N. McBroom, the father of this defendant. All of the parties lived in the town of Hulbert, Cherokee county, Okla. At the time of the controversy Howell was engaged in the livery business, and I. N. McBroom and his wife were running a restaurant, and the defendant Willie McBroom lived with his father and stepmother. Howell boarded at the McBroom restaurant, and his livery stable was located on the same street with the restaurant, with a vacant lot or two between the two places of business. Prior to the time of this controversy the parties had evidently been on friendly relations with each other. The trouble apparently arose over the relative racing merits of a couple of horses owned by parties living in that community. The trouble occurred in front of Howell's livery stable on the afternoon of the 3d day of November, 1920. Old man McBroom had probably been drinking some that day, but the defendant, Willie

McBroom, had not been drinking. As to what occurred immediately preceding and at the time of the difficulty, the prosecuting witness, Howell, testified in chief as follows:

"Q. Did you see the old man, Newt McBroom, there that day? A. Yes, sir. Q. Did you see him when he come up to the front part of your barn? A. Yes, sir. Q. Did any one come with him, and, if so, whom? A. A man we called Os Neal. Q. Which direction did they come from? A. Coming from towards the restaurant. Q. Going east? A. Yes, sir. Q. What condition were they in? A. Just walking along with one another. I disremember whether they had a hold of one another's arms or hands or not; they were together. Q. What condition were they in—drunk or sober? A. That man, Neal, looked about like he had drank some that day and old man McBroom, I am not—I did not—I did not pay any particular attention to him acting like he was drunk at that time. Q. Where were you standing at the time these men came up there? A. Standing right at the outside of this pole. Q. Inside or outside? A. On the outside, on the dirt walk. Q. Where was this negro, Ed Cole? A. Standing just to one side of this door. Standing there together talking. Q. Which direction was he from you? A. On the right of me. Q. And east of you or west of you? A. West of me. Q. Standing west of you? A. Yes, sir. Q. How long had you been there when these people came up there? A. I disremember. Some little bit. He got down and talked to me. Q. What did he do with his horse? A. He had a hold of it. Q. Had it up on the sidewalk? A. Yes, right across the sidewalk. Q. Across the sidewalk? A. Yes; holding the reins towards him. Q. The head of the horse was pointing towards this door was it? A. Yes, sir. Q. Which way was the rear of the horse? A. It was standing directly north and west, a little bit to the south. Q. Now, tell the jury, what was said and done when these two men came up? A. Well, this man Neal proposed to this colored man a horse race. The first that was said. He proposed a horse race, and the colored man saw that he was drinking, and he said, 'No; he didn't want to run it,' and he had some silver in his hand, and he said, 'Let's match a

quarter then,' and Ed said, 'No,' and they were coming passing around the horse's heels— Q. Whose? A. Ed Cole. Q. Who? A. Wm McBroom and Neal, Os Neal we called him, and I said, 'Neal, I bet you $10 that horse can outrun that horse we run this morning,' and he said, 'No; I have a horse at home that can outrun him, and I bet you $50 he can outrun him,' and I said, 'No; ten is enough,' and old man McBroom spoke up and said, 'I will bet you $50,' and I said, 'No; let's bet ten,' and he said, 'No; I bet you fifty,' and he said, 'You damn lying son of a bitch, you won't bet nothing.' Q. 'You damn lying son of a bitch, you won't bet nothing?' A. Yes, sir. Q. Where was he standing? A. Passed around the horse and standing almost in front of me, about three feet. Q. Where was Neal? A. Probably a step on his right. Q. When you say 'Mac,' you mean I. L. McBroom? A. Yes, sir. Q. All right. What happened? A. When he called me that, 'You damn lying son of a bitch, you won't bet nothing,' I said, 'I cannot take that, Mac,' and he jerked his knife, and when he did that I struck at him with my fist, and he struck me with his knife, and this man Neal tripped me, and when I went down on my hands and knees this man Will struck me with a knife— Q. When did you first see the knife? A. Just as quick as he said, 'You damn lying son of a bitch.' Q. Did you see him open it? A. It was open when it come out of his pocket. Q. When you told him that you wouldn't take it then was when he pulled the knife, is it? A. Yes, sir. (Mr. Coursey: Object to the leading of witness.) Q. When He pulled the knife what did you do? A. When he pulled the knife I struck with my fist, and this man tripped me, and when I fell he reached right over my neck and cut me, and as I was getting up almost straight up, that man W. M. McBroom stabbed me in the throat. Q. On which side? A. On the right side. Q. Had you seen W. M. McBroom before that? A. Never seen him until he got in two feet of me. He was making that strike when I saw him. Q. What condition or shape were you in? A. I was just getting up. Had not gotten straight up yet. Q. Did this defendant, W. M. McBroom, say anything? A. If he did, I didn't hear it. Q. Did the old man say anything? A. He was cutting after me and

had the knife in his hand cutting toward me. Q. What did Will do when he cut you? A. He jumped off a piece and then got his father and started towards the restaurant."

The defendant McBroom, in detailing what occurred at the time of the difficulty, testified in part as follows:

"Q. Do you know whether you were—where were you at the time A. C. Howell and your father got into this trouble out there? A. No, sir. Q. Did you see your father with Os Neal at the time they went up to that livery stable? A. No, sir. Q. State whether or not you came along there? A. The first time I saw them they were— Q. If you came along there, from what place had you come? A. From the drug store there. Q. Where is it from the livery stable? How far away? A. It is almost a block away I guess. Q. On the same side of the street, is it? A. Yes, sir; on the south side of the street. Q. Almost a block from the livery stable and on the south side of the street? At the time that you came along there do you know how long it had been since you had seen your father or Os Neal? A. I had not seen Os Neal all day. Q. Was any one with you when you came along there? A. No, sir. Q. Who did you see? How did you come—first? A. I came west on the south side of the street and got to by Mr. Thomas' store and heard some loud talking and saw my father and Mr. Howell there. Q. And who else? A. Ed Cole and Jeff Smith and Os Neal. Q. What did you do then? A. They seemed like they were in a racket, and I walked across the street where they were. Q. What did you do when you got there? A. I said, 'Come on, let's go to the house and not be having any trouble out here.' Q. What did—what occurred then? A. He said, 'All right, and started to go with me.' Q. Now, what next attracted your attention? A. Just as I got up there I heard Father say that he got a horse that could outrun Ed Coles' horse, and I heard Howell tell him that he was a God damn lying son of a bitch, and he wouldn't do anything and papa— Q. That was when you told your father to go to the house, was it or not? A. Yes, sir; and papa said, 'Mr. Howell, I hate to take that, I am not able to fight you,' and Howell, he had on a jumper and he started to take

it off and put it back on and run his hand in his pocket and jerked out a knife and made for my father. Q. Do you know whether he opened it? A. Yes, sir. Q. What did he do? A. He run up, but Jeff Smith and Os Neal made a run to stop him. Q. All right, tell what happened? A. He fell on his way —I don't know which tripped him. Q. Who fell? A. Mr. Howell. Q. What happened then? A. When he fell my father stepped off from him—backed up a step or two, and as he got up he made for him again and then I went into him. Q. What did you do? A. I run and stabbed him. Q. Why? A. I did it to protect my father—to keep him from killing my father. Q. Did you think he was going to cut your father? A. Yes, sir; he was making at him with a knife, and had it open. Q. You say when he first started at your father he opened the knife—before he fell? A. Yes, sir. Q. Did you see the knife after that? A. No, sir. Q. After the time that you saw it open and— A. No, sir. Q. After he made —A. No, sir; just as he struck at my father I struck at him. Q. After he had gotton up? A. Yes, sir, after he had gotten up. Just as he struck at my father I struck him—stabbed him right in there. Q. Which hand did you use? A. My left hand. I cannot very well use my right hand. I haven't got one. Q. You are practically one handed? A. Yes, sir. Q. And you thought that was the only manner you had of stopping him? A. Sure, I could not handle him fair. Q. Do you know what your father's condition was at that time? A. Well, yes; he was—he had a bad side. He had trouble with it, and the doctor claimed he had appendicitis. Q. When you struck him that one lick, what did he do? A. He whirled around. Q. What did he do? What did you do then? A. I got my father and told him to come on down to the house. Q. Did Howell say anything after you struck him? A. He said, 'I will get you sons of a bitches,' and started for the barn, and I took my father and went on down towards the restaurant. Q. Did you personally know whether or not he had anything in the barn? A. Howell? Q. Yes. A. I knew that he kept a gun in there—six-shooter. Q. Do you know what he did when he first went back towards the barn? A. He grabbed a monkey-wrench. Q. What did he do with it? A. Threw it at us, my father

and I, as we were going away from him. Q. When you went up on the porch, do you know who, if any one, was there? A. On the porch? No; my stepmother was out on the porch. Q. Do you know of anybody else? A. No, sir; I don't remember whether anybody else was there or not. Q. Did any one stop you or interfere with you from cutting the prosecuting witness any further? A. No, sir; nobody ever tried to stop me. When he stopped we stopped. All I was trying to do was to stop him. After he stopped I stopped and got my father and took him down to the house.''

The prosecuting witness testified that he and Willie McBroom had never had any trouble before that—''had never had a hard word.''

On cross-examination, the prosecuting witness further testified as follows:

''Q. When that man cut you, he then took his father back to the porch? A. Yes, sir. Q. Which porch? A. His restaurant. Q. How far from the barn? A. Twenty-five feet from my wall to his wall. Q. East or west? A. West to their place of business. Q. And the east side of that porch—the porch is on the south side of the restaurant and the east end of the porch is 25 feet from the west of your barn? A. Yes. Q. And that is the direction they were going when they left? A. Yes, sir. Q. Where was Ed Cole? A. When the fellow hit at me he jumped on his horse and jumped out in the street. Q. After you say this second lick was struck, what did you do? A. I made for the barn. Q. What did you do? A. I made after my gun. Q. Did you get it? A. Yes, sir. Q. Had you gotten anything before that time? A. I first grabbed this monkey-wrench. I thought they were both going to cut me again. Q. What did you do with it? A. I threw it and run after my gun. Q. They were going away, were they? A. Yes, sir. Q. At that time they were going away? A. Yes, sir.''

There was also some evidence by other witnesses, both on the part of the state and on the part of the defendant, which tended respectively to corroborate on the one hand

the prosecuting witness and on the other hand the defendant. We deem it unnecessary to enter into a detailed statement of the testimony of each and every witness. Suffice it to say that the foregoing statement fairly presents enough of the evidence to afford a clear understanding of the theories of both the state and of the defendant. The evidence is directly conflicting, and the record presents a close case on the facts.

J. I. Coursey, for plaintiff in error.

George F. Short, Atty. Gen., and Baxter Taylor, Asst. Atty. Gen., for the State.

MATSON, P. J. (after stating the facts as above). Of the various errors assigned we deem it only necessary to give full consideration to those relative to the charge of misconduct on the part of the special prosecutor.

The motion for a continuance on account of the absence of the witness Os Neal was properly overruled. There was no abuse of discretion in denying the continuance. There is no showing of any greater likelihood of having obtained the attendance of this witness at a subsequent term of court, had the cause been continued. Furthermore, the record discloses that the testimony of the witness, if present, would have been cumulative of that introduced at the trial.

The errors assigned relative to the instructions and refusal to give requested instructions are not sufficiently meritorious to require of themselves a reversal of this judgment. An examination of the instructions given convinces us that the trial court fairly covered the law of the right of a son to defend his father. For a full discussion of this right see the opinion of this court in Moore v. State, 25 Okla. Cr. 118, 218 Pac. 1102.

We now revert to that assignment of error which we deem the most serious, and which, in view of the conflicting nature of the testimony and the unsatisfactory evidence of guilt, is considered sufficiently prejudicial to require that this defendant be granted a new trial. It has frequently been held by this court that the improper remarks of a prosecuting officer, objected to at the time, will be considered and construed in reference to the evidence, and, if it appears that the improper argument may have determined the verdict, a new trial should be granted. Watson v. State, 7 Okla. Cr. 590, 124 Pac. 1101; Mulky v. State, 5 Okla. Cr. 75, 113 Pac. 533.

During the course of argument of counsel employed to assist in the prosecution, it was stated "that McBroom called Howell a black republican son of a bitch, and that said McBroom is not a republican." Counsel for the defendant objected, and the court instructed the jury not to consider the fact that McBroom was not a republican. Counsel further stated "that he had known the parents of this prosecuting witness, and that he did not blame the prosecuting witness for wanting to fight him for calling him that, that his mother was a splendid woman, and that he don't know but that the flowers are growing on her grave, and that he don't know but that her spirit has gone above." These remarks objected to, and the court instructed the jury not to consider remarks of counsel. Further in the argument the following argument was objected to and the court overruled the objection and permitted the remarks to stand: "Fourteen Mile creek is known as Dead Man's Valley, so many men have been murdered who now sleep there in their graves, and their bones are bleaching all over that country."

This prosecution was based on section 1756, Compiled Statutes 1921, which provides:

"Any person who intentionally and wrongfully shoots, shoots at, or attempts to shoot at another, with any kind of firearm, air gun or other means whatever, with intent to kill any person, or who commits any assault and battery upon another by means of any deadly weapon, or by such other means or force as likely to produce death or in resisting the execution of any legal process, is punishable by imprisonment in the penitentiary not exceeding ten years."

Defendant was found guilty of the crime defined by section 1764, Compiled Statutes 1921, which provides:

"Any person who, with intent to do bodily harm, and without justifiable or excusable cause commits any assault upon the person of another with any sharp or dangerous weapon, or who, without such cause, shoots or attempts to shoot at another, with any kind of firearm or air gun, or other means whatever, with intent to injure any person, although without intent to kill such person or to commit any felony, is punishable by imprisonment in the penitentiary not exceeding five years, or by imprisonment in a county jail not exceeding one year."

The jury assessed the maximum punishment provided by the statute for the latter crime. The prosecuting witness himself testified that, before old man McBroom or this defendant struck him with a knife, he had struck at old man McBroom with his fist. He admits that he struck the first blow. On this proposition there seems to be no conflict. The defendant says that the prosecuting witness ran his hand in his pocket and jerked out a knife and "made for my father," that the prosecuting witness was tripped and fell, and that his father backed off from the prosecuting witness a step or two and that the prosecuting witness made for his father again, and it was not until this time that the defendant cut him with a knife in order to protect his father. There is also no dispute in the record as to the fact that this defendant

only cut the prosecuting witness once, that he and his father immediately left the scene of the difficulty, but that the prosecuting witness went into his barn and procured a monkey-wrench which he threw at old man McBroom and this defendant, who were then leaving the place. This is admitted by the prosecuting witness, and the incident itself shows that the prosecuting witness was angry at that time at old man McBroom and Willie McBroom, and a consideration of the entire record indicates that there was more animosity against the McBrooms on the part of the prosecuting witness than on the part of this defendant against him. The evidence in this case is not such as to require or demand the severest penalty of the law for the lower grade of felonious assault defined by section 1764, supra. Had the jury not been appealed to in the manner above indicated, we seriously doubt whether this defendant would have been found guilty of any grade of felonious assault. There is no evidence to indicate that he entered into the dispute and controversy that resulted in the cutting of Howell until such a time as this defendant believed his father, an old man, was in danger of being cut by Howell. We have no sympathy for one who resorts to the use of a knife in defending himself. The brave man never does that, but there is some excuse for this defendant in view of the fact that he was a frail man and had but one hand, and was unable to fight with his fists. It must also be remembered that on the spur of the moment this all happened. These parties had been friends. The prosecuting witness said that there had never been a hard word between him and this defendant. The prosecuting witness was at that time boarding with the mother of this defendant, and there appears no reason from any of the testimony on the part of the state or on the part of the defendant why this defendant should want to inflict a serious injury upon the prosecuting witness.

A conviction of a felonious assault under this evidence ought not to be permitted to stand. It will forever brand this young man as a felon. We do not believe the evidence is susceptible of a fair construction which should impute a felonious intent on the part of this defendant to kill or to commit serious bodily injury upon Howell by the use of the knife. Taking that view of the evidence, it is apparent to our minds that the inflammatory remarks of the special prosecuting officer were calculated to influence the minds of the jurors and to arouse their prejudice against offenses of this character and thereby against the defendant himself. The argument was not legitimate. Counsel went beyond the bounds of fair argument to discuss matters outside of the record and of a very inflammatory nature. These were not matters of common notoriety or of public history, but were matters peculiarly within the knowledge. of the one making the argument. They were highly improper as comments upon matters not in evidence and not legally competent and admissible in evidence. The fact that the trial court instructed the jury not to consider some of these remarks to some extent alleviated the injury, but we are unable to disabuse our minds of the conviction that, all the evidence considered, the jury would not have found this defendant guilty on such a state of facts of a felonious assault, had not their minds been inflamed by such a line of argument.

Were this not a close case on the facts, a different result might and probably would be reached by this court, but where the evidence of guilt is so unsatisfactory, and the remarks so clearly prejudicial, we cannot escape the conclusion that this defendant would either have been acquitted of the charge or else have been found guilty of a lower degree of assault. For such reason, therefore, the judgment is reversed,

and the cause remanded to the lower court, with instructions to grant the defendant a new trial.

BESSEY and DOYLE, JJ., concur.