# TOM ALBERTY v. STATE.

No. A-9546.   Dec. 21, 1939.

(97 P. 2d 904.)

Joe Eaton, of Okmulgee, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Jess L. Pullen, Asst. Atty. Gen., for defendant in error.

DAVENPORT, J. Tom Alberty, the defendant in the trial court, was by information jointly charged with Leo Bailey and George Siggins; was tried separately, found guilty, and sentenced to serve a term of five years in the state penitentiary. Motion for a new trial was filed, considered, and overruled; and the defendant appeals.

Ed Jones, the prosecuting witness, in substance testified for the state that he had lived in the city of Henryetta since 1932.

"The defendant came to my house in the afternoon of the 21st day of November, 1934, in company with Willie Elmore and these other parties. Elmore introduced Bailey, Siggins, and Alberty to me. I had never met any of these parties prior to that day. They wanted to buy some whisky. I told them I did not have any whisky, and that they could buy it from some other parties as cheap as I could. I told them I would try to buy the whisky and they went away. I told them to be back about 7 o'clock.

"These parties were at my house about thirty minutes the first time they came They returned and knocked on the door; came in and wanted me to take a drink of whisky. I told them I didn't drink. They wanted to know if I had found the whisky. I said, 'Fool around for awhile.' I went and got in my car and went to Blackie Myers' on the hill. He didn't have any. I came back and put my car in the garage. As I was closing the door, I was assaulted and robbed of $24 in money.

"I was struck by Siggins; and, I think, I was struck by the defendant Alberty. I did not know. I had never met either of these defendants prior to that night."

The witness denied that he was engaged in the whisky business.

"While I was putting my car in the garage, the parties that robbed me drove in the alley within 20 feet of my garage, behind me; then Siggins said, 'Did you make it?', and just hit me on the head with the gun; then Alberty hit me. I couldn't tell what he hit me with. I was knocked out, cut on the face. Bailey got out and beat me with the gun. I had a little better than $24 in my pocket.

"I never saw Tom Alberty, the defendant in this case, after that time until the preliminary. It was 10 or 15 days though.

"This occurred in Henryetta, Okmulgee county, Oklahoma, November 21, 1934. The parties came to my house because Elmore said I might know where they could get some whisky. I knew some who did handle whisky. I went out and tried to find out where I could get whisky for them. I went to Blackie Myers' and other places.

"They didn't strike me from behind; they struck me square in front. I did not talk to them before they hit me. Siggins said, 'Do you have it?' 'No,' I said about the same time he hit me. I wasn't able to sit up for three days.

"When the defendant came down here, he had on work clothes."

"Q. What is there about this man that makes you think he is the man? A. I picked his picture out of about 50. Q. I didn't ask that. A. I talked to him twice. Q. What is there about him that makes you think he is the man? A. Because I remember him. Q. You just remember him? A. How else would I remember? Q. Anything you can point to and describe that would pick him out from any other man? A. Wouldn't you know me the first thing? Q. Not asking you that. You could be mistaken— you can be mistaken sometimes? A. I might be in some small things, but take a fellow who wants you to go to a friend to buy whisky, you really look him over. Q. You were not in the whisky business? A. No, he come to a

friend of mine to see if I could get it. Q. You looked him over? A. Yes, sir. Q. That is the reason you remember him so well? A. Just know him, that's all there is to it."

Fannie Jones stated that she was the wife of Ed Jones on November 21, 1934, living at 902 West Division in Henryetta, Oklahoma.

"About five o'clock, November 21, 1934, three men drove up in a red wheeled Chevrolet coupe with a rumble seat. I noticed Mr. Jones and Mr. Elmore sitting on the porch. This party was on the east side of the car. He had on work clothes and a khaki cap.

"About supper time while we were having supper, I heard a knock on the door, and I started to get up, and my husband said, 'I will go.' This defendant and two others were standing in the door. I didn't know the gentlemen. One said, 'Have you gone yet? I said, 'What on earth?' Mr. Jones said, 'No,' he would go. He told me he was going out to see if he could get some liquor.

"In about 30 minutes Mr. Jones came in bloody as a hog. He had a cut on his head, the side of his face, and his head was broken in. I called Tom Liddell and Dr. Kilpatrick. The next night Tom Liddell and Cliff Sullins brought a big lot of pictures. By Mr. Eaton: That is incompetent. By the Court: Yes. I saw the defendant Alberty at the preliminary. I identified him as one of the three that came to our house. The fellow that sat in the middle didn't have a hat. The one at the steering wheel was a little taller and had on a hat. When they came to the door about seven o'clock, this fellow didn't have his cap on. They all left the house together."

On cross-examination the witness stated that about 5 o'clock in the afternoon before the alleged robbery was the first time she ever saw the defendant.

"It was about dark when they came to our house. I met Jim Hammond the next morning. I didn't inquire what the men came to our house for. I had an idea what they came to our house for, but I really didn't know. Mr.

Jones told me what they wanted. I didn't see them any more from that evening until the preliminary. The defendant is one of the men that were at our house. He suits my recollection of one. He had on work clothes and a khaki cap. I have been mistaken lots of times in trying to identify people. I cannot point out anything that would make me know him. I didn't pay that close attention to him. I don't believe I ever mistake somebody for anybody else. I don't claim to be perfect at identification."

Willie Elmore, testifying for the state, stated:

"I lived in Henryetta on November 21, 1934; was living north of town. I know the defendant Tom Alberty. I know when he was out to my place. I had seen him a few times prior to that. I had come from town on the day of the alleged robbery. I live about a quarter north of Henryetta. These parties drove down to the section line and overtook me. Leo Bailey and this defendant and, I believe, they introduced me to another fellow as Steadham or Steadman; never saw him before. Leo Bailey called me over to the car and wanted to know if I knew of anybody who had any whisky. They asked me where a fellow named Allen lived. They said they were going to have a party in Tulsa and wanted some whisky. I told them several people in Henryetta handled whisky. He said, 'Pay you well.' I went to town with them to see Jones, the prosecuting witness in this case. Got out of their car and called Jones out. He told them they could buy the whisky cheap as he could, but told them he would try to locate some and to come back at 7 o'clock. They drove me back out home. I never saw them after that."

Cross-examination:

"Q. That has been about four years ago, hasn't it? A. Count it yourself. Q. I asked you. By the Court: Answer his questions. A. About four years, I guess. I don't remember every word that was said. I work on the W. P. A. I was farming at that time, about four miles and a half north of Henryetta. Leo Bailey had been to my house to a dance, a hoe-down. I guess he lived at Okmulgee, I couldn't tell. Q. Leo Bailey lived in the peniten-

tiary a long time, do you know that? A. No, not at that time. I couldn't swear I ever saw the defendant before the evening of November 21, 1934. Q. Were you ever mistaken in your life? A. I don't know. I never saw Bailey after that evening until I saw him here in court at the preliminary. Bailey had been to my house to a dance with Ode Hammond. When I met these boys, Leo Bailey began the conversation. The defendant in this case didn't do any of the talking. I was not in the whisky business. I had been later back. I was convicted one time in Okmulgee. The last time I had been in the whisky business was six years ago. I took these parties to Jones' place, thinking he might tell them where they could get the whisky. He was not in the whisky business at that time, I don't reckon. I recognize the defendant from his face. You see a man once. He has a scar on his face on the left side. As well as I remember he had his cap on and khaki pants. I do not remember the kind of jacket. I do not mean to say to the jury that I could not have been mistaken. I sure saw the defendant at the preliminary. I had never seen Siggins before that date. I saw Siggins at the preliminary."

On redirect examination:

"Q. You couldn't say whether he jumped his bond or not, could you? A. No, sir."

Tom Liddell, a witness for the state, stated that he was chief of police of the city of Henryetta.

"I know Ed Jones, the complaining witness. I remember the evening that it was alleged that he was robbed. I went out to his place that night about eight o'clock. I saw Mr. Jones. There was a hole in one side of his head and one side of his face or somewhere, plumb in. I went out to investigate this alleged robbery. By Mr. Eaton: We object to that as not binding on this defendant, incompetent, irrelevant, and immaterial. By Mr. Wallace: He can tell what investigation he made. By the Court: He can tell what he found—not any conversation except in the presence of the defendant. A. Do you mean what

investigation I made about the parties? Q. Your purpose was to investigate this robbery, was it? A. Yes, sir. Q. Without telling what he said, did Mr. Jones describe these parties to you? By Mr. Eaton: I object as leading and suggestive, incompetent, irrelevant, and immaterial. By the Court: Overruled. By Mr. Eaton: Exception. A. Well, he described the height of them, tried to describe them the best he could. Q. Did he later describe these parties? A. Yes, sir. Q. Where was that? By Mr. Eaton: Objected to as leading. By the Court: Don't lead. By Mr. Wallace: That is preliminary. By Mr. Eaton: This is purely hearsay; he has told what this prosecuting witness did. All based on hearsay. Q. You helped locate these parties? Tell the jury what you did in the way of locating them. By Mr. Eaton: I object to that as incompetent, irrelevant, and immaterial. By the Court: Overruled. By Mr. Eaton: Exception. By the Court: Just tell what you did towards the investigation of this case. By Mr. Wallace: About locating these defendants. A. Well, sir, I took a bunch of pictures down to— By Mr. Eaton: Object to that. By the Court: Overruled. By Mr. Eaton: Exception. A.—to Jones' house. Q. What kind of pictures? A. Pictures we had gotten from McAlester, the penitentiary. Q. Did these pictures have names on them? A. Yes, sir. Mr. Jones picked these three—. By Mr. Eaton: I object to that—. By the Court: Mr. Jones' statement would not be competent. The witness can testify he took the pictures out there. It is not competent for him to say what Mr. Jones said. By Mr. Wallace: Yes. Q. You took these pictures from McAlester, you took them out there? A. Yes, sir. By Mr. Eaton: Wait a minute— we object as incompetent, irrelevant, and immaterial. By the Court: Overruled. By Mr. Eaton: Exception. By Mr. Wallace: (continuing) Q. For what purpose did you take them out? By Mr. Eaton: We object as incompetent, irrelevant, and immaterial, not binding. By the Court: Objection sustained. Q. Did Mr. Jones look at the pictures? A. Yes, sir. By Mr. Eaton: I move to strike the answer. By the Court: Overruled. By Mr. Eaton: Exception. Q. About how many pictures did you have there? By Mr. Eaton: We object to that as incompetent, irrele-

vant, and immaterial, not binding on the defendant. By the Court: Overruled. By Mr. Eaton: Exception. A. 40 or 50. Q. 40 or 50? How long after Mr. Jones examined the pictures until this defendant—these defendants—were arrested? By Mr. Eaton: We object. All based on hearsay, not binding. By the Court: Overruled. By Mr. Eaton: Exception. A. Well, probably 14 or 15 days."

Cross-examination by Mr. Eaton:

"Q. Where are these pictures? A. I don't know; I gave the bunch to Barney Jameson at the show, I don't know where they are. By Mr. Eaton: We object to all this conversation, incompetent, irrelevant, and immaterial, not binding on the defendant, and ask the court not to consider it. By the Court: Overruled. By Mr. Eaton: Exception."

The foregoing is all the testimony introduced by the state.

Jake Alberty, testifying for the defendant, stated that he was 74 years old and lived in West Tulsa, Okla.; that he was born in what is now Oklahoma, a few miles from the Arkansas line; that he served two terms as sheriff of Adair county, Okla., Stillwell being the county seat.

"The defendant Tom Alberty is my son. I have lived in Tulsa fifteen years; live now at 2304 South Phoenix, West Tulsa, Okla. I have never been arrested. I remember when Tom was arrested about four years ago for the offense on which he is now being tried. He was living at home at that time. I think it was Thursday that he was arrested. I learned in the next few days what he was arrested for. When I came home from work on Wednesday afternoon, the day before the alleged robbery in the evening, Tom was at home. After lunch he went up town. He came back home about 9 or 10 o'clock, I guess. My wife and I had gone to bed. He was there the next morning when we got up."

Cross-examination:

"November 21, 1934, was Wednesday. Tom, the defendant, was not working that day. I don't know Leo Bailey;

see him off and on. I believe that I had seen him prior to November 21, 1934. I was never personally acquainted with him. He never did come to my house. I did not see him and Tom associating together. I don't know where Leo Bailey is now. I have not seen him but once since he came back from the penitentiary. I have seen George Siggins, but was never acquainted with him. I did not know there was such a man prior to November 21, 1934. I saw him first when he was down here in jail. My son sat down and ate his lunch about 4 o'clock in the afternoon. He was at home the next morning when I went to work. After he got through eating he stayed a few minutes and went up town. I saw him the next morning. I got up about 5 o'clock. I knew he was in bed as I had to pass through his room when I started the fires. It was Thursday morning that he was in bed. I heard him when he came in that night to go to bed. I don't know whether my son and Leo Bailey were together when they were arrested or not. I went out of business as sheriff of Adair county in 1916."

The defendant Tom Alberty, testifying in his own behalf, stated:

"My name is Tom Alberty. I am 25 years old. I never was in jail until after I was arrested and brought down here. I did not know George Siggins until after he was arrested. I just did know Leo Bailey. I was not in Henryetta on the 21st of November, 1934, with these boys or at any other time. I never saw Ed Jones until today. I never have been in the penitentiary. In 1934 I weighed about 135 pounds. I weigh 180 pounds now. In 1937 I pleaded guilty to the possession of whisky at Tulsa."

Cross-examination:

"I live in Tulsa now. I was living there on November 21, 1934. I worked in the oil fields. I did not personally know Leo Bailey. I became acquainted with him; he lived over there in West Tulsa and he had a murder trial. I got acquainted with him just after the trial. I was not a witness in the case. After the trial I saw him a time or two. That was in 1933, I think, about six months before this

robbery occurred. After we got out of jail down here, I think he went to the penitentiary. Q. For what charge? By Mr. Eaton: We object. By the Court: Overruled. By Mr. Eaton: Exceptions. A. If the truth was known, this man Bailey was on a parole. By Mr. Eaton: How can this be material? All hearsay. By the Court: Go ahead. By Mr. Wallace: Q. Was Leo Bailey also engaged in the liquor business? A. No, sir. Q. What was his racket? A. I don't know. Q. What did he go to the penitentiary for? A. I don't know. On parole or something. He has been in the penitentiary since this case was filed."

The witness continued:

"Leo Bailey was put in jail about the same time I was, but not the same day. I was arrested first and put in jail at Tulsa. After I had my lunch at home that evening, I went out that night to a pool hall; remained there until they closed. I guess about eleven o'clock. I arrived at the pool hall about six o'clock. I don't know the exact time. I did not know George Siggins until after we got in jail down here. I have not seen Leo Bailey since he got in the penitentiary; heard he was out. If they had a picture of me with a number of others, I don't know how they got it. I never served a term in the penitentiary. I was never photographed in any penal institution. The scar on the left side of my face has been there ever since I was a kid. I had a blue serge suit on when I was arrested, and was wearing a hat; never wore a cap since I was a kid. I do not know the witness Elmore. The first time I ever saw him was when he came on the witness stand awhile ago."

Jake Alberty was recalled, and stated:

"My son, Tom Alberty, was never convicted of any crime or served a term in the penitentiary at McAlester or any other penal institution."

Clyde Blakely, testifying for the defendant, stated his name was Clyde Blakely and that he had lived in Tulsa since 1903.

"I am a merchant police. I have served in that capacity 15 years this coming July. I have served as an officer in the state about 35 years. I have known Mr. Alberty since 1922 or 1923. I know the defendant in this case. They used to be my neighbors."

The witness testified that the defendant's reputation in the community in which he lived in Tulsa was good.

"If he was engaged in the liquor business, it was since that time. I have seen some awfully good men mixed up in the selling of whisky. I have never been engaged in selling whisky. When I am down town of afternoons, when I get up, I see him around with the other boys. He may play a little pool, I don't know. He works sometime in his father's place to relieve him temporarily while his father was sick."

On cross-examination the witness stated that Mr. Alberty's family all have good reputations.

Bob Conner testified for the defendant:

"I have lived in Tulsa 28 years. I have known Jake Alberty, the father of this defendant, for 15 years. I run a tourist camp now. I had a plumbing business for sometime. I have lived in Tulsa 28 years, but known them 15. I have known the defendant as long as I have known his father."

The witness stated that the defendant's reputation was good.

"On November 21, 1934, I was living at 3710 South Sapulpa Road, where I had a tourist camp. This camp is about a half mile from the defendant's home. I have 27 cabins. He comes out to see me occasionally. Not for any particular purpose; comes out to visit with me. I could not say what work he was doing on November 21, 1934, nor could I say how long it had been since he had had a job. He was on made work, when he worked that way. I couldn't state the date. Q. Are you hard of hearing or does the passing trains bother you? A. Hard of hearing.

Before I had the tourist camp, I was in the plumbing business. I have never been convicted of violating the liquor laws."

The state recalled the defendant Tom Alberty for further cross-examination.

"Q. Do you know a party living near Henryetta named Jim Hammond? A. Used to know him in Tulsa a long time ago; not acquainted with him, just know of him, never knowed him. About the time of this robbery I was not at the Hammond home with Leo Bailey. I was never in Jim Hammond's home in Henryetta."

Jim Hammond was called as a witness, and the defendant objected to the witness testifying on the ground that he was not used in chief. The witness stated:

"I know the defendant Tom Alberty; have known him since 1927. I know Leo Bailey; have known him all his life. I recollect of hearing about Jones being robbed. Q. Along about that time did you see Tom Alberty and Leo Bailey here in Henryetta? By Mr. Eaton: Objected to. By the Court: Overruled. By Mr. Eaton: Exception saved. By Mr. Wallace: Q. Answer the question. A. I did not. Q. Did you see them near Henryetta? A. They was at my place. I don't know what time it was. The boys were at my place several times; used to visit with me. Q. That was sometime about the time of the robbery. A. I don't know. I couldn't tell you. I did not keep tab. I couldn't tell you when they came to my house together. Q. I will ask you if they came to your house if they were looking—if they were inquiring for anything? By Mr. Eaton: That wasn't asked this defendant; not in rebuttal of anything. By the Court: Overruled. By Mr. Eaton: Exception. Q. When they came by your house did they inquire for any particular person? A. Who do you mean came to my house? Q. Tom Alberty and Leo Bailey. A. No, they were not inquiring for anything in particular. Q. Do you know whether they were with Willie Elmore that day? A. No sir, I don't. I don't know whether they have ever been to my house but one time." Q. Are you re-

lated to either one of these boys? A. This boy Bailey is my nephew."

Ed Jones was called in rebuttal. "I am the complaining witness in this case."

Fred Alberty was called in surrebuttal.

"My name is Fred Alberty, and I am a brother of the defendant. I am older than the defendant. I live in Tulsa, Okla. I have met and seen Jim Hammond since I have been here. Jim Hammond mistook me for Tom. I was standing down in front of the courthouse yesterday morning. He walked up and said, 'Hello, Tom.' I afterwards told him he was mistaken."

On cross-examination the witness stated:

"I said, 'Yonder goes Tom.' Hammond went on down and spoke to Tom. I don't know whether he shook hands with him or not."

The foregoing is the substance of all the testimony taken at the trial.

The defendant has assigned 13 errors alleged to have been committed by the court in his trial. The errors the court will consider first are assignments 3 and 13. Assignment 3 being as follows:

"For that the court erred in admitting over the objection and exception of the defendant incompetent, irrelevant and immaterial evidence."

And assignment 13:

"That the court erred in overruling plaintiff in error's motion for a new trial to which rulings plaintiff in error at the time excepted."

The question for this court to determine from the record before it is, Did the defendant have that fair and impartial trial guaranteed to him by the Constitution and laws of our state?

In Sutton v. State, 35 Okla. Cr. 263, 250 P. 930, this court stated in the first syllabus:

"Every person charged with crime, whether guilty or innocent, is entitled to a fair and impartial trial according to the due and orderly course of the law, and it is a duty resting upon the courts to see that the guaranty of such a trial, conferred by the laws upon every citizen, shall be upheld and sustained." Chuculate v. State, 36 Okla. Cr. 404, 254 P. 984.

There is no controversy that the prosecuting witness, Ed Jones, was robbed on the 21st day of November, 1934, at his garage near his home in the city of Henryetta, Okmulgee county, Okla.; but it is disputed by this defendant that he was present on that night and took any part in the robbery.

It is further disputed that he was in the city of Henryetta on the night of the alleged robbery of the prosecuting witness, Ed Jones.

Ed Jones and his wife testified for the state, and also Willie Elmore.

The record discloses that Jones and Elmore had at one time or another been engaged in the whisky business. Jones says he was not in the whisky business at that time, and so does Elmore, one of the state's witnesses who attempts to identify the defendant in this case.

It is shown by the record that whoever the parties were that met Elmore and asked him about getting some whisky were driven by Elmore to the Ed Jones place. Elmore stated that he thought Jones might be able to tell the parties where they might find some whisky. Elmore's testimony clearly shows that he was familiar with those who were and had been handling whisky.

Neither Ed Jones nor his wife had ever seen the defendant before that evening. It was dark; and they state it was about dark when these parties came to the Jones home. They attempt to describe the way the parties were dressed; and the testimony of the defendant upon that question contradicts and shows clearly that he was not dressed as they said he was, and that he had never worn a cap since he was a child.

So far as the testimony shows, the prosecuting witness did not see the defendant from the date of the robbery until the preliminary, which was several days thereafter. Neither Mr. Jones nor Mrs. Jones had any specific description of the defendant by which they claim to have identified him other than their natural view of him which was, as shown by the record, in the night-time. The only time there is any evidence of a light being turned on is when they claim the parties, whoever they were, came back to the Jones home about seven o'clock that evening, and Ed Jones turned on the light. After they had seen the defendant at the preliminary, the witness Elmore attempts to say that he recognized the defendant by reason of a scar on his face. Neither of the other state witnesses makes any mention of this scar, and do not claim to have seen a scar on defendant's face.

This offense was alleged to have taken place in November, 1934; and the trial was not had until April, 1938, nearly four years after it is claimed the robbery took place.

In the meantime, after the defendant was arrested in 1934, he was in jail for sometime, and the witnesses had an opportunity, if they desired to do so, to visit the jail and see the defendant, and try to identify the defendant at the preliminary hearing. Neither Mr. Jones nor Mrs. Jones attempted to identify the defendant by any scar on

his face. Elmore, testifying nearly four years after the alleged robbery, mentions the fact that the defendant had a scar on his face.

The record also shows that the father of this defendant, Jake Alberty, who had served as sheriff of his county of Adair, Okla., two terms, and after his term of sheriff expired had moved to Tulsa, Okla., and had been living there for 15 years or more and had always borne a good reputation, testified that on the afternoon of the day of the alleged robbery that night, the defendant, Tom Alberty, his son, was in Tulsa, and came to his home where he lived with his father and mother, had his supper, and after he had his supper went up town and came in sometime in the evening after his father and mother had retired for the night about 10 or 11 o'clock. The father further testified that the next morning, when he got up preparatory to going to work, he went into the room where Tom was sleeping to light the fires, and that Tom was in bed at that time.

The defendant, testifying in his own behalf, stated positively that he was not in Henryetta at that time and had never been in Henryetta with Leo Bailey at any time, and that he had never met George Siggins until after they were placed in jail on the charge for which he was on trial.

Willie Elmore, an admitted violator of the prohibition law, if not engaged in the whisky business at the time of this alleged offense, had been before engaged in the whisky business. He shows by his statement that he drove these defendants to Ed Jones' house, that he knew Ed Jones was either in the whisky business at that time or had been, and would know where whisky could be found.

Elmore, nearly four years after the alleged offense, attempted to identify the defendant by a scar on his face.

It is not denied by the defendant that he had a scar on his face. The scar had been there since he was a young boy; however, in the meantime, from the time of the alleged robbery up until the trial, Elmore had had an opportunity to see the defendant at the preliminary and when he came to trial nearly four years after the alleged offense, and could have made up this story of identification without any chance for the defendant to contradict him.

All the state's witnesses had an opportunity to see the defendant when he was brought to trial in the preliminary and bound over to the court having jurisdiction of the offense of which the defendant was charged; and the case dragged along for almost four years before the state brought it to trial. The testimony of the state attempts to identify, and if not contradicted would be sufficient to establish the fact that the defendant was one of the parties who took part in the robbery.

The defense of the defendant contradicts the statement of the state and attempts to establish an alibi for the defendant, showing the defendant was at another and different place the night of the robbery; and his father testified that the defendant was not in the city of Henryetta at the time alleged, but was in the city of West Tulsa and remained there, and went to his bedroom to bed at 10 or 11 o'clock in the evening, and was there the next morning when his father went into his room to start the fires.

The father of this defendant was born and reared in what is now Adair county, state of Oklahoma; but at the time he was born it was the Cherokee Nation, Indian Territory. He had held the office of sheriff in his county, and as shown by his neighbors and friends to be a man of integrity and honor.

The defendant in this case called witnesses who also testified to his good reputation.

It is earnestly urged, and with merit, that the court committed reversible error in permitting the witness Liddell, over his objections, to testify that he took a number of photographs that he had secured at the state penitentiary down to the Ed Jones home, and that Ed Jones and his wife picked three of them out. In other words, the defendant insists that the admission of the testimony of Liddell was not only prejudicial to his rights and deprived him of a fair and impartial trial as guaranteed to him under the laws of our state and the opinions of this court. Wingfield v. State, 55 Okla. Cr. 374, 30 P. 2d 930; Peck v. State, 52 Okla. Cr. 212, 4 P. 2d 127.

The testimony of Liddell complained of by the defendant is set out in full supra.

This court has repeatedly held that an accused, whether guilty or innocent, is entitled to a fair and impartial trial according to due and orderly course of law. Goben v. State, 20 Okla. Cr. 220, 201 P. 812; Melton v. State, 53 Okla. Cr. 360, 12 P. 2d 251.

This court has further held that it was the duty of the trial court to see that the guaranty of a fair and impartial trial should be upheld and sustained.

The defendant insists that Liddell's testimony with reference to the pictures was incompetent evidence and prejudicial to his rights and deprived him of a fair and impartial trial.

It is clear from the evidence that the photographs taken to the home of the prosecuting witness by the chief of police were for the purpose of establishing an extrajudicial identification of the defendant.

An examination of the evidence of the prosecuting witness Jones and his wife, when they attempted to identify the defendant, clearly shows that their identification of him at the trial was based on their conclusions reached from their examination of the photograph taken to their home by the witness Liddell.

This testimony and the attempted identification of the defendant was extra-judicial; and, therefore, under the authority of this court was incompetent and inadmissible, and the trial court committed reversible and prejudicial error in the admission thereof. The statement of the chief of police, Liddell, was to the effect that he had procured these photographs from the penitentiary at McAlester, and there were 40 or 50 of them taken to the home of Ed Jones and shown or exhibited to Jones and his wife, and claimed that from these pictures the prosecuting witness and his wife identified the defendant and his codefendant. The testimony also shows that the names of the parties were on the pictures.

The state closed its case without introducing any testimony to show that the defendant had been in the penitentiary; and the defendant testified positively that he had never been in the penitentiary. His father corroborates him on this statement, and says that the son had never been in the penitentiary.

In Johnson v. State, 44 Okla. Cr. 113, 279 P. 933, this court said:

"In the trial of an accused for robbery, where the issue is whether the defendant is the person who robbed the prosecuting witness, testimony of what prosecuting witness said in identifying or describing the robber at some other time or place is not admissible as original testimony. In like manner, the testimony of the officer that from such description he arrested the defendant is hearsay and inadmissible."

The character of proof of the testimony of witness Liddell for the state is referred to in the books as "extrajudicial identification", and is generally held to be inadmissible. Reddick v. State, 35 Tex. Cr. R. 463, 466, 34 S. W. 274, 60 Am. St. Rep. 56; State v. Egbert, 125 Iowa 443, 101 N. W. 191; People v. Johnson, 91 Cal. 265, 27 P. 663; People v. McNamara, 94 Cal. 509, 29 P. 953.

It is clear that the taking of the photographs from the penitentiary of many individuals to the home of the prosecuting witness Ed Jones, where they were examined and statements made that they identified three of them as being the parties that robbed the prosecuting witness, was such testimony as would have a bearing upon the minds of the jurors. It was an attempt to show that the defendant had been in the penitentiary, and while there he was photographed, and that his photograph had been sent from the penitentiary up to the witness Liddell, who had gone to the Jones home for the purpose of having them see if they could identify either one of the photographs as being a photograph of either of the parties who were charged with robbing Ed Jones.

It cannot be contended that this character of testimony was not prejudicial to the rights of the defendant; and especially is this true when the state, after introducing the testimony of Liddell as to the photographs and as to what took place at the prosecuting witness' home as to the photographs and the identification of the defendant, offered no evidence to show that this defendant had ever been in the penitentiary.

The truth is that he had not been in the penitentiary; and there had been no photographs of him made by any authority of the state or nation.

It was very damaging testimony to the defendant in view of the fact that his identity was very doubtful; and his testimony as to not being in Henryetta the night of the robbery was positive.

In Calloway v. State, 60 Okla. Cr. 293, 64 P. 2d 935, in the first syllabus, this court said:

"Where incompetent evidence is admitted over the repeated objections of accused, and it is apparent from the record that the admission of such evidence deprived accused of a fair trial, the conviction will be reversed and cause remanded."

In Reddick v. State, 35 Tex. Cr. R. 463, 466, 34 S. W. 274, 60 Am. St. Rep. 56, the third paragraph of the syllabus is as follows:

"Evidence by the state was given that, the next morning after the rape, prosecutrix related the fact to her brother-in-law and wife. Some of the details of her complaint were admitted without objection. Held, that it was error to admit, as original evidence, testimony of the sheriff that a certain boy at the jail identified defendant, among several prisoners, as the one who committed the crime, and as to the circumstances under which the identification was made."

The state in its brief cities Winfield v. State, 18 Okla. Cr. 257, 191 P. 609, to sustain the action of the trial court in admitting the evidence of the witness Liddell as to the photographs and the identification and the testimony tending to show the extra-judicial identification of the defendants, and quoted the third syllabus as follows:

"The admission of immaterial evidence is not ground for reversal, unless the defendant was prejudiced by its admission."

This is not disputed by the defendant, and is good law.

It is not urged by the defendant that his case should be reversed if the record does not show that the defendant was prejudiced by the admission of the testimony of witness Liddell.

This court insists that the testimony of Liddell was inadmissible, incompetent, and deprived the defendant of the right to a fair and impartial trial.

The admitting of this incompetent evidence may well have influenced the verdict of the jury and caused the minds of the jurors to be biased and prejudiced against the defendant.

The view we take of this record, it is not deemed necessary to consider the other errors assigned.

For the error in the admission of the testimony hereinbefore stated, the case is reversed.

DOYLE, P. J., and BAREFOOT, J., concur.