## MARK C. COMBS v. STATE.

No. A-10863. Sept. 8, 1948.

(197 P. 2d 524.)

284

George H. Jennings, of Sapulpa, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Lewis A. Wallace, Asst. Atty. Gen., for defendant in error.

BRETT, J. Defendant Mack C. Combs was charged in the district court of Tulsa county, Okla., with the murder of Thomas Major, tried and convicted of manslaughter in the first degree. The jury left the punishment up to the court and defendant was sentenced to fifteen years in the State Penitentiary. The killing occurred on August 10, 1946, as the outgrowth of a dispute over the payment of some delayed house rent due the defendant from Major.

The record discloses that the deceased and his wife had been drinking beer and enjoying the pleasure of taxicab accommodations during the day, and that the defendant reasoned that if they could afford such luxury they should pay him the house rent which was past due in the approximate sum of $27. When the defendant saw the deceased Major and his wife arrive by taxicab, he sent his wife, Mary Combs, over to the rental property occupied by Major to get the rent. Major was drinking a bottle of beer which, upon his arrival, he had gone to the nearby store and purchased. Mrs. Combs said she said nothing to him relative to the rent. As she turned to go back to her home, the deceased Major said "tell Mack I will see him." The record further shows that Major said to his wife, Lucille, "be careful, Lucille, I am afraid we are going to have trouble * * *." And

then he left to go to the defendant's place to talk about the rent. The deceased's wife, Lucille Major, followed him with her baby, taking with her the 20-gauge shotgun they had borrowed a short time before from the defendant, Mack Combs. Before going to Mack Comb's home the deceased took his 20-gauge shotgun outside and fired it in a field, so his wife said, to see if it would work, and in anticipation of going hunting the next day. It appears to us this was an idle gesture, and that the real objective may have been to remind Mack Combs that they had his shotgun and shells, before talking to him about the rent. The deceased then went to Comb's home, and found the defendant seated on a bed. Mrs. Major waited outside with the 20-gauge shotgun. There is considerable conflict in the evidence as to what transpired between Combs and Major. Mrs. Major, in substance, said she could not hear distinctly what was said between the two men as there was a partition between them and her and the window through which she was listening. Then, too, she said the baby was crying. In substance, she said she heard her husband say he could not pay the rent, and the defendant said he would "or else I will burn you out." Her husband is supposed to have replied "not with all of those children down there." (He had four little girls and another child was on the way.) The latter point defendant assigns as the basis for error in the introduction of evidence. Then she said the defendant said "I will shoot you out." That is all she said she heard. The defendant's and his wife's version is quite different. The defendant said Major was pretty well liquored up when he came to see him. The defendant and his wife both testified, in substance, that the question of the rent came up, and the deceased said he had not been on his new job long enough to get paid and, therefore, could not pay the rent. The defendant

said he told the Majors "You had a good time riding in the taxi and drinking beer," and that he thought he was stalling. Then the defendant said the deceased got wild, started waving his arms, said he wasn't going to pay, and Combs could not make him pay. Defendant said he told the deceased "let's don't argue," and in substance, but that he would have to move and that he would help him by using his own truck without charge. The deceased said he would not move. Defendant told Major he didn't want any trouble, apparently having heard the deceased fire the 20-gauge shotgun and being reminded of the fact he told the deceased that he had his 20-gauge shotgun. He said he wanted it back, but he would not go get it himself, that he would send his wife, May, back with him to get it. That Major said "I'll give it to you, all right, I'll give it to you." Defendant says he walked to the door with the deceased and told him "You give May the gun, you'll feel better tomorrow and we will talk this over." Major and Mrs. Combs left. Defendant says he then sat down on the bed. The record shows defendant needed the rent to keep up his loan payments on his property. The record further discloses that the deceased and Mrs. Combs hardly had time enough to walk around the house when the defendant heard Mrs. Combs say "My God, Lucille, what are you doing with that gun?" The defendant says he then grabbed up his 410-gauge gun, and went out after them. When he got outside Major had the 20-gauge shotgun up to his shoulder and said he was going to shoot Combs. The defendant, Combs, said he tried to talk him out of it. Combs said up to this point he believed that Major was bluffing, and then he threw up his 410-gauge shotgun and fired at Major at about 15 feet from him, killing him. Both the defendant and his wife said it was still light outside, in fact, so light you could recognize

acquaintances a block away. Mrs. Major said her husband came out the front door, walking quite fast, and Mrs. Combs was following him. That when her husband reached the ashpile he exclaimed "he has a bead on me, Lucille, do something." Mrs. Major said she didn't tell her husband she was bringing the 20-gauge shotgun, and he didn't know she had it. She also said she didn't know the defendant had a gun. She said it was so dark she didn't see the defendant when he shot her husband, that all she could see was the fire from his gun. In fact, she said it was so dark her husband could not see she had a gun and notwithstanding she said her husband reached and got the gun from her. Mrs. Major said she didn't know whether her husband had the gun raised in a firing position when her husband was killed or not. It is apparent that Mrs. Major's testimony, if believed, would lead to the belief that Combs was chasing the defendant from his home with the gun when he said "he has got a bead on me, Lucille, do something." The record further discloses that when Major was killed he had possession of the 20-gauge shotgun, and had it pointed in the direction of the defendant. This is conclusively shown by the fact that the deceased was shot over the chest, heart and lungs, the left forearm, back of the left hand and the left side of the chin. Moreover, the record discloses the 20-gauge shotgun held by Major had been hit by shot fired from the gun held by the defendant, two shot struck the stock of the gun, two had struck the grip, two hit the end of the gun barrel, and the shell in the chamber of the gun had been perforated by shot indicating that some of the charge fired at Major had gone down the inside of the gun barrel. This analysis discloses a strong conflict in the evidence. Upon this record the defendant questions the sufficiency of the evidence upon which to base a conviction. We must ob-

serve, while it may be conceded there is strong evidence to show the killing was in self-defense, there is also sufficient competent evidence, which if believed, would establish the killing was unlawful. Under these conditions this court has repeatedly held in substance, that the Criminal Court of Appeals will not weigh conflicting and contradictory evidence which has been passed on by a jury and when such evidence is substantial, such a case will not be reversed on the grounds of insufficiency of the evidence. Chapman v. State, 84 Okla. Cr. 41, 178 P. 2d 638. Moreover, this court has repeatedly held that, before we will interfere with the jury's verdict on the ground of insufficiency of the evidence, there must be no competent evidence upon which a verdict could be based. Rule v. State, 84 Okla. Cr. 347, 182 P. 2d 525; Sheehan v. State, 83 Okla. Cr. 41, 172 P. 2d 809, 810; and other cases too numerous to cite. Therefore, we are not confronted with a situation relative to insufficiency of the evidence herein, entitling the defendant to relief on that ground, and this contention of the defendant is without merit.

Defendant further complains that the trial court erred in permitting the admission of highly incompetent evidence. This contention is based upon the following evidence, to wit:

"Q. How many children do you have? A. Four. Q. Are you expecting another child? Mr. Jennings: To which we object as incompetent, irrelevant and immaterial. The Court: Overruled. Mr. Jennings: Exception. A. Yes, I am."

On its face the foregoing would seem inconsequential, but when considered in light of the fact that at the time of this tragedy, as well as at the time of trial of the case, there was an acute housing shortage, it is most

material. The question of the number of children the deceased had, and the pregnancy of the deceased's wife, was in no way an issue in the case. In considering the vicious effect of this evidence we must take judicial knowledge of the fact that following World War 2 there was and still is a great housing shortage. This fact, at the time of the trial of this case, was common knowledge. It therefore appears to us that the asking of these questions could have but one objective, that was to make it appear the defendant was ejecting an expectant mother and their four children from their home, in the face of the likelihood of not being able to find another home. It was an attempt to appeal to the prejudice then existing against proceedings in ejectment and against landlords in general. In the face of the competent factual record it may have been the one thing decisive of the issues herein. It certainly contributed to the verdict of guilty, depriving the defendant of a fair trial, and in our opinion is ground for reversal. In Fisk v. State, 56 Okla. Cr. 373, 40 P. 2d 684, 685, this court said:

"Where incompetent evidence has been received which in the light of the entire record probably contributed to the verdict of guilty, the admission of such evidence is ground for reversal."

See Hull v. State, 61 Okla. Cr. 12, 65 P. 2d 423; Alberty v. State, 68 Okla. Cr. 246, 97 P. 2d 904.

Next the defendant complains of the misconduct of the assistant county attorney in asking question relative to incompetent and prejudicial matter which prevented the defendant from having a fair trial. This contention is predicated upon the following questions, answers, and objections, propounded and brought out on cross-examination:

"Q. (By Mr. Simms) You never moved the gun down to the new house, did you? A. No, sir. Q. Why did you leave it up at the old house? A. I didn't have any use of it down at the new house. Q. Didn't have any use of it at the old house? A. No, sir. Q. You shot it about a month before this, didn't you? A. Possibly I did. Q. Well, you did, didn't you? A. I guess so. Mr. Jennings: We object to that as improper cross-examination. Mr. Simms: It certainly is. The Court: Well, he has answered. Q. (By Mr. Simms) you knew how to shoot that gun, didn't you? A. Yes, sir, I shot a chicken with it every once in a while. Q. About a month before that you didn't shoot a chicken, did you? Mr. Jennings: Just a minute, if the court please. The Court: I will sustain the objection. Mr. Jennings: I ask that the jury be admonished not to consider it. The Court: Yes, gentleman of the jury, that question, you will not pay any attention to that."

It is apparent the sole purpose of this examination was to leave the impression with the jury that the defendant had shot at some other person, a month or so before the killing herein involved. When Mr. Jennings objected to evidence relative to the defendant shooting the gun a month before this tragedy, on the ground it was improper examination, the county attorney clearly indicated that his conduct was deliberate when he said "it certainly is." His persistence is further indicated by the following portion of the record as follows, to wit:

"Q. (By Mr. Simms) That made you pretty mad when he came home in a taxi, didn't it? A. No, I didn't get mad about it. Q. You get mad pretty easy, don't you? A. No, I don't. Q. You don't? A. No, sir. Q. Were you drinking that day? A. No, sir. Q. Is that one of the days you didn't drink? Mr. Jennings: Now, if the court please, we object. The Court: Sustained. Mr. Jennings: We now ask, if the court please, that a mistrial be granted in this case. The Court: No. Gentlemen of the Jury, you will not pay any attention to

that question. That is not cross-examination, Mr. County Attorney. * * * Mr. Jennings: I except to the court's failure to pass on my motion. * * * Q. Now, I believe you testified on direct examination that Major was pretty well liquored up? A. Yes, sir. Q. How do you know? A. Well, I have seen a few drunks in my time. Q. You have been drunk a few times also, haven't you? A. I have. Mr. Jennings: If your Honor please, I object to that, and ask that the jury be admonished. The Court: That statement of the county attorney will be stricken, gentlemen of the jury."

The purpose of this questioning was to degrade the defendant to the level of a common drunkard. The defendant's drinking habits were not in issue in the charge herein involved. The evidence does not indicate in the slightest that the defendant on this occasion was drinking, much less that he was drunk. Such questions and conduct by the assistant county attorney were highly improper. The attitude of the assistant county attorney partakes of police court methods, which this court vigorously condemned in Hager v. State, 10 Okla. Cr. 9, 133 P. 263, wherein this court said:

"1. Police court methods in the examination of witnesses in courts of record in Oklahoma will not be tolerated.

"2. Great latitude should be allowed in the cross-examination of witnesses, and they may be interrogated in a proper manner with reference to any matter which may tend to affect their credibility, but they should not be asked questions which are full of insulting insinuations and intimations that they are guilty of some other crimes than that for which they are upon trial.

"3. Where the record shows that counsel for the state in a prosecution of a person charged with crime has been guilty of conduct calculated to arouse prejudice or passion against the defendant and to prevent

the accused from having a fair and impartial trial, a conviction had will be set aside, nad a new trial granted."

In Bean v. State, 77 Okla. Cr. 73, 138 P. 2d 563, 564, this court said:

"The repeated asking of incompetent questions, which clearly have for their purpose the intimation of something to the jury that is either not true or not capable of being proven if true, is wrong, and such conduct of counsel is not cured because the court sustains objections to the questions.

"3. In jury trials, incalculable harm is often done by counsel in asking known incompetent questions in the hearing of the jury and thereby forcing the adverse party to object to them also in the hearing of the jury, which manifests a fear of the incompetent questions, and gives emphasis to the harmful matter they are supposed to contain."

See, also, Watson v. State, 7 Okla. Cr. 590, 124 P. 1101.

In view of the fact that this case was close from a factual standpoint, and might have exonerated the defendant on the ground of self-defense, we are inclined to believe that the incompetent evidence and insinuations which the jury was permitted to hear was most persuasive on them, and that even the court's admonition not to consider the same did not cure the evil effects. Counsel for the state should refrain from asking known incompetent questions, and thus require the defense counsel to give emphasis to and manifest fear of such harmful matter thus brought out in a trial. Such conduct on the part of counsel for the state may in a close case unlawfully tip the scales of justice; and we believe that was true in the case at bar.

Counsel raises objections to the court's instructions. We have carefully examined them, and find these objections to be without merit. For all of the foregoing reasons, this case is reversed and remanded for new trial consistent with the principles herein announced.

BAREFOOT, P. J., and JONES, J., concur.